Ingrid Mae HADDOW, Plaintiff and Appellant,

v.

John David HADDOW, Defendant and Respondent.

No. 18368.

Supreme Court of Utah.

Sept. 30, 1985.

David O. Drake, Costa Mesa, Cal., for plaintiff and appellant.

John D. Parken, Salt Lake City, for defendant and respondent.

DURHAM, Justice:

This is an appeal from a decision in which the trial court found that appellant was cohabiting with a man and ordered her to pay to her former husband one-half of the equity in the home in which she was living, pursuant to an equitable lien established in the divorce decree. Because we believe that the trial court improperly construed the language of the decree, we reverse.

The parties in this action, appellant Ingrid Haddow and respondent John Haddow, were divorced on September 11, 1980. Mrs. Haddow waived her right to alimony. She was awarded custody of the parties' three children, who ranged in age from seven years to thirteen years. Mr. Haddow was ordered to pay child support in the amount of $450 per month, and Mrs. Haddow was awarded the parties' home, subject to an equitable lien in favor of Mr. Haddow of half the equity in the home. The equity was to be payable upon any of the following occurrences: all of the children ceased to reside in the house or Mrs. Haddow moved out of the house, remarried, or "cohabited with a male person."

After the divorce, Mr. Haddow entered the house and took several items without Mrs. Haddow's permission. Thereafter, in February 1982, Mrs. Haddow obtained a temporary restraining order enjoining Mr. Haddow from coming to the house without her express permission. A short time later, Mr. Haddow filed a motion for an order requiring Mrs. Haddow to pay him one-half of the equity in the home because she was allegedly cohabiting with a man.

At trial, the testimony centered on the nature and extent of appellant's relationship with her boyfriend, Hy Hudson. There was no dispute that Mr. Hudson spent most of his free time with appellant. The trial court found that Mr. Hudson had dinner at appellant's house five or six times

a week, that on those occasions he usually stayed until sometime between 10:30 p.m. and midnight, and that he would often return in the morning to have coffee or breakfast with appellant before work. The court also found that Mr. Hudson spent the night with appellant approximately once a week. There was testimony that Mr. Hudson left some clothes at appellant's house and that she did some of his laundry and sometimes took clothes to the dry cleaner for him. Mr. Hudson occasionally showered and changed at the house, particularly when he worked late and was going out for the evening with appellant. Mr. Hudson maintained a separate residence, however, living at his parents' home. Although Mr. Hudson used appellant's mailing address for a couple of bank accounts, he testified that he also received mail at his ex-wife's address, as well as at his parents' home. There was no evidence that Mr. Hudson and appellant shared any assets or had any joint financial accounts, projects, or liabilities. On several occasions, Mr. Hudson gave appellant money to reimburse her for the food he ate. He also took her car to be serviced at the car dealership where he worked. Beyond that, Mr. Hudson made no financial or tangible contributions to appellant or to her household, nor did he share living expenses with her in any sense.

On appeal, Mrs. Haddow challenges the trial court's conclusion that she was cohabiting with Mr. Hudson. In its memorandum decision, the trial court stated that there was no substantial conflict in the testimony as to the facts of the relationship between appellant and Mr. Hudson and that the controversy was whether their conduct constituted cohabitation within the meaning of the divorce decree. Although the trial court labeled its resolution of that question a "finding of fact," the determination of whether given circumstances constitute cohabitation requires the application of the terms of a court order to a given set of facts. This process is in reality a mixed question of fact and law, and we are not bound by the conclusion reached by the trial court. *See Olwell v. Clark*, Utah, 658 P.2d 585, 586 n. 1 (1982). Moreover, in reviewing a trial court's actions in a divorce case, we are vested with broad equitable powers. *See Read v. Read*, Utah, 594 P.2d 871, 872-73 (1979).

In reaching its decision, the trial court did not specify its definition of "cohabitation." As the trial court pointed out, the term "cohabitation" does not lend itself to a universal definition that is applicable in all settings. As a legal concept, cohabitation has been the determinative issue in cases involving validity of marriage, *see, e.g., Boyd v. Boyd*, 228 Cal.App.2d 374, 39 Cal.Rptr. 400 (1964); legitimacy of offspring, *see, e.g., Burke v. Burke*, 216 Or. 691, 340 P.2d 948 (1959); criminal prosecution of cohabitants, *see, e.g., State v. Barlow*, 107 Utah 292, 153 P.2d 647 (1944); and statutory and nonstatutory termination of alimony payments, *see, e.g., Kaplan v. Kaplan*, 186 Conn. 387, 441 A.2d 629 (1982) (statutory); *Simms v. Simms*, 245 Ga. 680, 266 S.E.2d 493 (1980) (statutory); *In re Clark*, 111 Ill.App.3d 960, 444 N.E.2d 1369 (1983) (statutory); *Zipparo v. Zipparo*, 70 A.D.2d 616, 416 N.Y.S.2d 321 (1979) (nonstatutory); *In re Marriage of Vasconellos*, 58 Or.App. 390, 648 P.2d 1358 (1982) (nonstatutory), as well as the enforcement of equitable liens, as in the present case. To some extent, the meaning of the term depends upon the context in which it is used. Nonetheless, a majority of cases and statutes that attempt to fix a definition of "cohabitation" follow the dictionary definition, which is: "To live together as husband and wife." *Black's Law Dictionary* 236 (5th ed. 1979); *Webster's Ninth New Collegiate Dictionary* 257 (1984).

Neither the word "cohabitation" nor any variation of it appears in U.C.A., 1953, Title 30, chapter 3, the statutory provision governing divorce. However, language we believe was drafted for the same purpose as the cohabitation clause in the divorce decree is found in section 30-3-5(3), which calls for the termination of alimony payments under certain circumstances. That section reads:

Any order of the court that a party pay alimony to a former spouse shall be terminated upon application of that party establishing that the former spouse is residing with a person of the opposite sex, unless it is further established by the person receiving alimony that the relationship ... is without any sexual contact.

Although this statute pertains exclusively to termination of alimony, we find it noteworthy that the statute predicates termination of spousal support on a showing that the former spouse is "residing" with a person of the opposite sex. Once residence is established, alimony obligations are terminated unless the recipient can show that the relationship is "without sexual contact." *Wacker v. Wacker*, Utah, 668 P.2d 533 (1983). This Court has already said that the residency contemplated by the statute is more than a temporary stay. *See Knuteson v. Knuteson*, Utah, 619 P.2d 1387, 1389 (1980) (where it was held that a stay of two months and ten days did not establish a "settled abode" (quoting *Webster's New Twentieth Century Dictionary*, 2d ed.)). However, in neither *Knuteson* nor *Wacker* were we called upon to define sexual contact.

We also note that neither the record nor the divorce decree itself indicates whether the cohabitation clause was stipulated by the parties to the decree or whether it was imposed by the divorce court. If the parties inserted the clause, they gave no testimony at trial as to how they intended it to be interpreted. If the divorce court judge inserted the clause, we are without benefit of his opinion in this matter since he did not hear this matter below and is now retired from the bench.

■ We therefore decide that there are two key elements to be considered in determining whether appellant was cohabiting with Mr. Hudson: common residency and sexual contact evidencing a conjugal association. Consistent with our holding in *Knuteson*, 619 P.2d at 1389, common residency means the sharing of a common abode that both parties consider their prin-

cipal domicile for more than a temporary or brief period of time. Sexual contact means participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife.

■ We first address the aspect of sexual contact. As noted above, the trial court found that Mr. Hudson spent the night with appellant an average of once a week. The findings do not indicate how long this conduct continued, but the record does show that at the time of trial, Mr. Hudson and appellant had been dating each other exclusively for about fourteen months. The court also found that appellant and Mr. Hudson had taken a vacation together to Hawaii, "sleeping in the same bed and having sexual relations," and that the couple had spent at least one night together in Elko, Nevada. So even if we disregard the possibility that sexual relations occurred on occasions when Mr. Hudson visited appellant's home but did not remain overnight, we are satisfied that the findings below on this point establish the presence of a relatively permanent sexual relationship.

In reaching his decision, the trial judge, who admittedly was hindered by a lack of applicable standards, placed considerable emphasis on the sexual aspect of the relationship between appellant and her boyfriend and on the effect on appellant's children of the exposure "to a bed and board arrangement between the custodial parent and a member of the opposite sex." Although we agree with the trial judge that this case involves a sensitive situation and we are similarly distressed by the circumstances of this trial where the children were called upon to testify as to the nature and extent of their mother's sleeping arrangements, we decline to predicate the disposition of the family home on such factors alone. The effect on the children of appellant's relationship with Mr. Hudson might be relevant in a custody dispute, assuming the requisite showing of substantial and material change in circumstances had been made, *see Becker v. Becker*, Utah, 694 P.2d 608 (1984), but custody is not at issue in this case and sexual contact, even

if extensive, does not alone constitute cohabitation. A fair reading of the language of this decree regarding payment of defendant's lien simply does not dictate such a result. In this regard, we find persuasive the reasoning of the Iowa Supreme Court in a similar case dealing with an equitable lien triggered by a cohabitation clause in a divorce decree:

> We take it from the ordinary meaning of the term, and gather from the obvious thrust of the dissolution decree, that a sexual relation was part of the intended definition. Cohabitation, in order to mature the lien, was to be with a person of the opposite sex. On the other hand the sexual relationship was only a part of the intended definition, not the whole of it. Another ingredient was dwelling, the facet of residing or living in the residence.

*In re the Marriage of Gibson,* Iowa, 320 N.W.2d 822, 823–24 (1982).

We turn now to the second part of our test for cohabitation: common residency. It is clear from the record that Mr. Hudson spent a substantial amount of time at appellant's home. However, the trial court made no finding that Mr. Hudson either spent any time at the home when appellant was not there or had a key to the house. These circumstances seem particularly significant on the question of whether Mr. Hudson was living with appellant, since a resident will come and go as he pleases in his own home, while a visitor, however regular and frequent, will schedule his visits to coincide with the presence of the person he is visiting. The language in *Burke v. Burke,* 216 Or. 691, 340 P.2d 948 (1959), summarizes this point well. There the court noted, "Cohabitation is not a sojourn, nor a habit of visiting, nor even remaining with for a time; the term implies continuity." *Id.* at 950 (quoting *In re Wray's Estate,* 93 Mont. 525, 19 P.2d 1051 (1933)). Further, there was testimony that Mr. Hudson did not move any furniture into appellant's home or keep there any personal items other than toiletry articles, a few items of clothing that appellant laundered or had dry cleaned, and one picture album. At trial, great emphasis was placed on the fact that Mr. Hudson brought the picture album to appellant's home and left it there. However, we fail to see any determinative significance in the presence of any one or all of these portable items in appellant's residence.

Nor do we find critical the fact that Mr. Hudson left a van belonging solely to him parked at appellant's home for several months. Mr. Hudson testified that he had no other place to store the van and that he used it primarily for occasions when he and appellant took his five children and her three children on outings together. Since Mr. Hudson's children live with their mother in a neighborhood close to appellant's home, we believe it was not unreasonable for Mr. Hudson to park his van in appellant's driveway for a period of time. It appears that, as Mr. Hudson claimed, the van was in storage at appellant's home, not kept on the premises for the convenience of daily use. On this point, we also note that throughout respondent's testimony on his two-week surveillance of Mr. Hudson's activities, the presence or absence of Mr. Hudson's Datsun, and not the van, was the criterion used to determine whether Mr. Hudson was at appellant's residence. It is apparent that even respondent assumed Mr. Hudson used the Datsun for his daily commuting, whereas the presence of the van told nothing of Mr. Hudson's whereabouts.

Our review of out-of-state case law discloses that in some jurisdictions a third element, shared living expenses, is either an essential ingredient of cohabitation, *In the Matter of Marriage of Edwards,* 73 Or.App. 272, 698 P.2d 542 (1985), or evidence of it, *In re Marriage of Roofe,* 122 Ill.App.3d 56, 460 N.E.2d 784 (1984). Although we do not consider the sharing of the financial obligations surrounding the maintenance of a household to be a requisite element of cohabitation, we do find it significant that Mr. Hudson did not pay any of appellant's living expenses or consistently share with her any of his assets. For example, Mr. Hudson did not contribute anything to appellant's mortgage pay-

ments, the insurance on her house, or her utility bills. His occasional payments to appellant for purchasing food and dry cleaning his clothes were reimbursements and evidence an intent to bear his own expenses, not an intent to contribute to appellant's household. Nor does it appear that Mr. Hudson considered his van, which he purchased during the time he and appellant were dating, the property of appellant. He alone paid for the van and for the insurance on it. We also note that appellant and Mr. Hudson rarely used each other's automobile, except at times when Mr. Hudson took appellant's Oldsmobile to perform mechanical maintenance on it and left his Datsun in its place.

In view of these circumstances, it is clear that neither appellant nor Mr. Hudson considered appellant's home Mr. Hudson's principal residence. It is therefore our opinion that the common residency element of cohabitation has not been established. Once again, the Iowa Supreme Court's language in *Gibson* is pertinent:

> The time petitioner's boyfriend spent in the dwelling was extensive, easily sufficient to qualify as residence if time alone controlled. But the time was not spent as a resident. He maintained a separate residence and shared none of the expenses of this one. He did not even have a key or freedom to enter it except when petitioner was present. In simple terms he did not live there.[1]

*Gibson*, 320 N.W.2d at 824.

██ In reaching our decision today, we construe this divorce decree so as to preserve what we believe to be the intent of the parties, while avoiding an interpretation that is guaranteed to heighten the tension between them and unnecessarily jeopardize the interests of the minor children. Thus, we hold that in a case involving the enforcement of an equitable lien on the home used by the custodial parent, "cohabitation" means to dwell together in a common residence and to participate in sex-

ual contact that evidences a larger conjugal relationship. While we do find sufficient evidence of sexual contact between appellant and Mr. Hudson, the facts as found by the trial court do not support a finding of common residency.

Reversed. Costs are awarded to appellant.

STEWART and ZIMMERMAN, JJ., concur.

HOWE, J., concurs in the result.

HALL, Chief Justice (dissenting):

I do not join the Court in reversing the trial court because the judgment is supported by substantial evidence and is reasonable and proper under the facts and circumstances of this case. In accordance with the time-honored standard of appellate review, the issue presented is best left to the determination of the trial court.

In reaching its conclusion to reverse, the majority applies a sterile definition of the term "cohabitation" which is not in context with the usage of the term in the decree of divorce. As was observed by the trial court, the term "cohabitation" does not lend itself to a universal definition that is applicable in all settings. This is particularly evident in the instant case. Plaintiff is certainly "cohabiting with a male person" at least on a part-time basis.

The fallacy in applying such a sterile definition of the term "cohabitation" can be seen by applying the definition to a situation where one cohabits with more than one male person during the week or, conversely, where the male person is otherwise occupied and therefore only able to cohabit weekly.

I would affirm the judgment of the trial court.

---

**1.** In *Gibson,* the evidence established the stability of the boyfriend's separate residence more clearly than did the evidence in this case. Nonetheless, we are persuaded here that the evidence of nonresidence was sufficient to conclude that there was no cohabitation.