2010 UT App 74

**Becky Sue MYERS, Petitioner and Appellant,**

v.

**Tracy Lynn MYERS, Respondent and Appellee.**

No. 20080911–CA.

Court of Appeals of Utah.

April 1, 2010.

Samuel M. Barker and Jeffrey A. Callister, Murray, for Appellant.

Guy L. Black, Provo, for Appellee.

Before Judges McHUGH, ORME, and VOROS.

## OPINION

VOROS, Judge:

¶ 1 Petitioner Becky Sue Myers (Wife) appeals the trial court's order terminating alimony on the ground that she was cohabitating in her parents' home with her parents' teenage foster son. We reverse.

## BACKGROUND

¶ 2 Tracy Lynn Myers (Husband) and Wife were divorced in June 2006, after eighteen years of marriage. Wife was awarded alimony. In the months following the divorce, Wife "never had a permanent home," but "bounced all over the place." She stayed with friends, with her daughters, and with her parents at their home in Provo, Utah.

¶ 3 Her parents' house had three bedrooms, one of which they occupied. The other two bedrooms were occupied by as many as six foster boys, including M.H. Grandchildren, great-grandchildren, and "ex-foster boys" also slept over from time to time.

¶ 4 When Wife stayed with her parents, she slept on a couch in the basement. She also received mail at her parents' address. Wife's family members testified that she never lived there, but would sleep over intermittently, "maybe once a month." But a private investigator hired by Husband observed Wife's car at her parents' house four out of the five days he drove past in June 2007,

including at least one time early in the morning. Based on this information, the trial court found "the most credible and persuasive evidence" to be that Wife "spent at least 80% of her nights" at her parents' home, and that it was, in fact, her residence in the spring and summer of 2007.

¶ 5 At the heart of this dispute is Wife's relationship with M.H. The trial court heard no direct evidence that Wife and M.H. had a sexual relationship. Wife testified that they did not. Husband acknowledged that he had no personal knowledge of a sexual relationship between Wife and M.H. Neither party called M.H. to testify.

¶ 6 Several witnesses described Wife's relationship with M.H. The parties' son (Son) swore in an affidavit that he "d[id] not have any doubt" that his mother was having a sexual relationship with M.H., that M.H. spoke of Wife "as his girlfriend," that they "flirt[ed] with each other all the time," that he once saw Wife pretending to be asleep on the couch while M.H. lay on the floor next to the couch, that Wife acted jealous when "she thought [M.H.] was hanging out with girls," and that he had seen M.H. acting "like a heart-broken, love-sick boy." Son also stated that Wife once borrowed his car so that she could visit M.H. after M.H. had moved to Salt Lake City. But at trial, Son equivocated on most of these points, admitting that he had "probably not" read his affidavit before signing it and acknowledging that he had no proof of a sexual relationship.

¶ 7 The parties' daughter (Daughter) also testified. Daughter's affidavit stated that M.H. and Wife "[were] always together whenever I [saw] them." She stated that she began to think there was a romantic relationship between Wife and M.H. when Wife asked her to get out of the passenger seat of her car so that M.H. could sit there. Daughter also observed them at a family party sitting "side by side, . . . treating each other as though they were boyfriend and girlfriend," and then leaving together. At trial, Daughter confirmed many of the statements

in her affidavit and testified that she believed Wife and M.H. had a romantic relationship because they fought like lovers rather than friends.

¶ 8 Based on this and other evidence, the trial court concluded that Husband had established that Wife and M.H. shared "a common residency." The trial court then ruled that, Husband having made this showing, "the burden of proving a lack of sexual contact shifts to [Wife]," and that Wife "has not met her burden to establish lack of sexual contact." On the contrary, the court "believe[d] that the most credible evidence before the [c]ourt indicate[d] that [Wife and M.H.] had a sexual relationship."

¶ 9 Having found that Wife and M.H. shared a common residence and had a sexual relationship, the trial court concluded it had "no wiggle room to look at equities, to look at fairness or anything like that," but "must find that under the Utah Code Annotated as amended in 1995 that a condition of cohabitation did exist." Accordingly, the court terminated alimony effective January 31, 2008.[1] Wife appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 10 The sole issue before us is whether the trial court erred in concluding that Wife was cohabitating and, consequently, in terminating alimony. "Whether cohabitation exists 'is a mixed question of fact and law. While we defer to the trial court's factual findings unless they are shown to be clearly erroneous, we review its ultimate conclusion for correctness.'" *Jensen v. Jensen,* 2007 UT App 377, ¶ 2, 173 P.3d 223 (quoting *Pendleton v. Pendleton,* 918 P.2d 159, 160 (Utah Ct.App.1996)).

## ANALYSIS

¶ 11 Utah Code section 30–3–5 lists seven factors a court "shall consider" in determining alimony. Utah Code Ann. § 30–3–5(8)(a) (2007).[2] All but one pertain to financial considerations:

---

1. The trial court noted that Husband had not otherwise established a change in circumstances that would have "resulted in a termination of alimony based on financial consideration."

2. The relevant portions of the Utah Code have not changed since the divorce. Except as otherwise noted, we cite to the current version for the reader's convenience.

(i) the financial condition and needs of the recipient spouse;

(ii) the recipient's earning capacity or ability to produce income;

(iii) the ability of the payor spouse to provide support;

(iv) the length of the marriage;

(v) whether the recipient spouse has custody of minor children requiring support;

(vi) whether the recipient spouse worked in a business owned or operated by the payor spouse; and

(vii) whether the recipient spouse directly contributed to any increase in the payor spouse's skill by paying for education received by the payor spouse or allowing the payor spouse to attend school during the marriage.

*Id.* In contrast to these mandatory considerations, "the fault of the parties" is at most a factor that the court "may consider" in determining alimony.[3] *Id.* § 30–3–5(8)(b).

■ ¶ 12 This statutory scheme makes clear that the principal purpose of alimony is economic, " 'to enable the receiving spouse to maintain as nearly as possible the standard of living enjoyed during the marriage and to prevent the spouse from becoming a public charge.' " *Ostermiller v. Ostermiller,* 2008 UT App 249, ¶ 3, 190 P.3d 13 (quoting *Paffel v. Paffel,* 732 P.2d 96, 100 (Utah 1986)) aff'd in part and rev'd in part on other grounds, 2010 UT 43, 233 P.3d 489; *see also* Utah Code Ann. § 30–3–5(8)(d) ("The court may, under appropriate circumstances, attempt to equalize the parties' respective standards of living."). " 'Alimony is *not* intended as a penalty against the husband nor a reward to the wife.' " *English v. English,* 565 P.2d 409,

411 (Utah 1977) (emphasis added) (quoting 2 Nelson *Divorce and Annulment* § 14.06 11–12 (2d Ed. 1961 Rev. Vol.)).

¶ 13 Unless a divorce decree provides otherwise, alimony "automatically terminates upon the remarriage or death" of the recipient spouse. Utah Code Ann. § 30–3–5(9). The recipient spouse cannot evade this result by merely cohabitating with another rather than remarrying: "Any order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person." *Id.* § 30–3–5(10). However, this statutory provision has spoken in terms of cohabitation only since 1995. Its predecessor statute divided the concept into (1) residing with a person of the opposite sex, and (2) sexual contact. *See id.* § 30–3–5(6) (1995). It also split the burden of persuasion; proof of common residency shifted the burden to the recipient spouse to disprove sexual contact:

Any order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is residing with a person of the opposite sex. However, if it is further established by the person receiving alimony that that relationship or association is without any sexual contact, payment of alimony shall resume.

*Id.*

¶ 14 In *Haddow v. Haddow,* 707 P.2d 669 (Utah 1985), our supreme court interpreted this subsection to refer to cohabitation, which in this context means " 'to live together as husband and wife.' " *Id.* at 671 (quoting *Black's Law Dictionary* 236 (5th ed. 1979); *Webster's Ninth New Collegiate Dictionary* 257 (1984)).[4] Thus, the court con-

---

3. The status of this factor is unclear. In *Riley v. Riley,* 2006 UT App 214, 138 P.3d 84, a panel of this court held that a husband's "extramarital affairs and ... prolonged deceitful conduct ... present[ed] precisely the type of situation where the legislature intended the trial court to consider fault" and his "fault [went] a long way in explaining the propriety" of an alimony award that "would be too high if only economic factors were considered." *Id.* ¶ 23. Three years later, in *Mark v. Mark,* 2009 UT App 374, 223 P.3d 476, a divided panel of this court, without purporting to overrule *Riley,* held that "until the legislature clearly defines fault in the statute, it is inappro-

priate to attach any consequence to the consideration of fault when making an alimony award." *Id.* ¶ 20. As the point is not essential to the resolution of the case at bar, we leave for another day the task of resolving this apparent "evolution of two conflicting interpretations of the same legal doctrine by different panels of judges." *State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993).

4. One term may have different meanings in different statutory contexts. Thus, as used in the Cohabitant Abuse Act, the term "cohabitant" includes many categories of persons who do not

strued the first statutory factor—residing with a person of the opposite sex—to mean "the sharing of a common abode that both parties consider their principal domicile for more than a temporary or brief period of time." *Id.* at 672. The court construed the second statutory factor—sexual contact—to mean "participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife." *Id.* It thus concluded that "'cohabitation' means to dwell together in a common residence and to participate in sexual contact that evidences a larger conjugal relationship." *Id.* at 674. This court has consistently applied this two-part test. *See, e.g., Pendleton v. Pendleton,* 918 P.2d 159, 161 (Utah Ct.App.1996); *Sigg v. Sigg,* 905 P.2d 908, 917–18 (Utah Ct.App.1995).

¶ 15 The legislature evidently approved the gloss *Haddow* placed on the subsection. In 1995, it abandoned any reference to the separate factors of common residency and sexual contact in favor of *Haddow's* focus on cohabitation. *See* Utah Code Ann. § 30–3–5(8) (Supp.1996). Jettisoned with the two factors was the shifting burden of persuasion; since 1995, the spouse seeking to terminate alimony bears the burden to establish cohabitation. *See id.* Even after this amendment, however, our cases have continued to see the related concepts of common residency and sexual contact as key in determining whether a couple is in fact cohabitating. *See, e.g., Jensen v. Jensen,* 2007 UT App 377, ¶ 2, 173 P.3d 223 (citing *Sigg,* 905 P.2d at 917). Factors bearing on this question include whether the parties have keys to a single house, *see Pendleton,* 918 P.2d at 161, keep their belongings in one home, *see Sigg,* 905 P.2d at 918, share meals and food expenses, *see id.,* and share living expenses or assets, *see Haddow,* 707 P.2d at 671.

¶ 16 Making cohabitation the standard for terminating alimony is consistent with alimony's purpose of enabling "the receiving spouse to maintain as nearly as possible the standard of living enjoyed during the marriage and to prevent the spouse from becoming a public charge." *Ostermiller,* 2008 UT App 249, ¶ 3, 190 P.3d 13 (internal quotation marks omitted); *see also Gayet v. Gayet,* 92 N.J. 149, 456 A.2d 102, 103 (1983) ("[There is] a policy to end alimony when the supported spouse forms a new bond that eliminates the prior dependency as a matter of law."). Just as the award of alimony "is not intended as a penalty against the husband," *English,* 565 P.2d at 411, neither is the termination of alimony intended as a penalty against the wife.

¶ 17 In light of the foregoing legal principles, we conclude that the trial court took an unduly narrow view of cohabitation. As noted above, while common residency and sexual contact are certainly key to the question of whether two people have formed a relationship resembling a marriage—most married couples do live together and have at least occasional sexual contact—the inquiry does not end there. A court must take the next step and determine whether the parties entered into a relationship "akin to that generally existing between husband and wife."[5] *Haddow,* 707 P.2d at 672.

¶ 18 Wife and M.H. clearly did not have such a relationship. In the late spring and summer of 2007, Wife spent 80% of her nights at her parents' home. Her stay there overlapped with M.H.'s stay as a foster child. But he shared an upstairs bedroom with one or more male roommates while she slept on a couch in the basement. They were romantically involved, were "paired up" at social

---

live together as husband and wife. *See* Utah Code Ann. § 78B–7–102(2) (2008). This court has previously stated that it sees in this broader definition "no legislative intent to abrogate the case law defining cohabitation in the alimony-termination context." *Hill v. Hill,* 968 P.2d 866, 868 (Utah Ct.App.1998). It is simply the case that "the supreme court has adopted a narrower definition in the alimony-termination context than the Legislature has in the cohabitant-abuse context." *Id.*

**5.** Cohabitation is not the same as so-called common law marriage. While cohabitation is one requirement of a valid but unsolemnized marriage, there are others. For example, the couple must "hold themselves out as and have acquired a uniform and general reputation as husband and wife." Utah Code Ann. § 30–1–4.5 (2007).

events, and apparently shared a furtive sexual relationship.[6] They treated each other as boyfriend and girlfriend. But they did not establish a common household; we have no evidence of shared expenses, shared decision-making, shared space, or shared meals. Nor did they maintain "a relatively permanent sexual relationship akin to that generally existing between husband and wife." *Id.* at 672. Whatever Wife and M.H.'s relationship was, it bore little resemblance to a marriage. Accordingly, they were not cohabitating for purposes of section 30–3–5(10). Terminating alimony on this ground was error.

### CONCLUSION

¶ 19 The trial court erred in concluding that Wife was cohabitating. Although Wife and M.H. sometimes slept under the same roof and may have been sexually involved, their relationship did not rise to the level of a relationship akin to that of husband and wife. Accordingly, terminating alimony on this ground was error. We reverse and remand for further proceedings consistent with this opinion.

¶ 20 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and GREGORY K. ORME, Judge.

---

**6.** We note that the trial court erred in ruling that once Husband proved common residency the burden of proving the absence of sexual contact shifted to Wife. As explained above, while the pre–1995 statute included this kind of burden-shifting mechanism, the current statute does not. It places the burden of proving cohabitation on the party seeking to terminate alimony. We also note that the evidence on this point was suffi-ciently tenuous that the placement of the burden might have been dispositive below. It is not, however, dispositive on appeal. Even assuming for purposes of our analysis that Wife and M.H. were having sexual contact, they were not living together in a manner akin to husband and wife, and thus were not cohabitating for purposes of section 30–3–5(10).