2011 UT 65

**Becky Sue MYERS, Respondent,**

v.

**Tracy Lynn MYERS, Petitioner.**

**No. 20100341.**

Supreme Court of Utah.

Oct. 21, 2011.

Samuel M. Barker and Jeffrey A. Callister, Murray, for respondent.

Guy L. Black, Provo, for petitioner.

Justice LEE, opinion of the Court:

¶ 1 Tracy Lynn Myers filed this suit in an attempt to terminate his alimony obligations to his ex-wife Becky Sue Myers on the ground that she had been "cohabiting with another person" under Utah Code section 30–3–5(10). The district court concluded that Ms. Myers had cohabited in her parents' home with their teenage foster son (M.H.), and on that basis terminated Mr. Myers's alimony obligation. The court of appeals reversed, concluding that cohabitation involves a "relationship 'akin to that generally existing between husband and wife'" and that Ms. Myers's relationship with M.H. "bore little resemblance to a marriage." *Myers v. Myers*, 2010 UT App 74, ¶¶ 17–18, 231 P.3d 815 (quoting *Haddow v. Haddow*, 707 P.2d 669, 672 (Utah 1985)).

¶ 2 We agree with the court of appeals and affirm. A spouse's alimony duty terminates by statute upon a finding of cohabitation. In this statutory context, cohabitation requires more than a sexual relationship between two individuals living under the same roof. It contemplates a relationship "akin" to a marriage. *Haddow*, 707 P.2d at 672. Ms. Myers's relationship with M.H. fell well short of that mark. The two may have had a sexual relationship and they may have slept in the same house for a time. But their relationship lacked any other marker of marriage-like cohabitation. Ms. Myers and M.H. lived as separate guests with distinct roles in the home of Ms. Myers's parents—Ms. Myers as an adult child sleeping on her parents' couch and M.H. as their teenage foster son living in a bedroom with other foster children. This relationship did not rise to the level of marriage-like cohabitation, and Mr. Myers's alimony duty was accordingly not affected by it.

I

¶ 3 Mr. and Ms. Myers divorced in 2006 after eighteen years of marriage. The divorce decree entered at that time required Mr. Myers to pay $1,200 in monthly alimony to his ex-wife. During the following year or so, Ms. Myers "bounced all over the place" and "never had a permanent home."

¶ 4 In the spring and summer of 2007, Ms. Myers resided at least some of the time at her parents' home in Provo. When she stayed there, Ms. Myers slept on a couch in the basement. The three bedrooms in the home were occupied by Ms. Myers's parents and by their foster children (one of whom was M.H.). Ms. Myers soon developed a relationship of some sort with M.H.—a relationship that Mr. Myers alleged (and Ms. Myers denied) to be sexual.

¶ 5 Mr. Myers filed a petition to modify the divorce decree in January 2008, seeking to terminate his alimony obligation on the basis of Ms. Myers's alleged cohabitation with M.H. The petition was tried to the bench in July 2008. After hearing testimony and evidence from both parties, the district court concluded that Ms. Myers had cohabited with M.H. and terminated Ms. Myers's right to alimony under Utah Code section 30–3–5(10).

¶ 6 The evidence at trial established that M.H. was a foster child who lived in the home of Ms. Myers's parents during the late spring and summer of 2007. It was also undisputed at trial that Ms. Myers stayed in the same home during at least part of that period. She also received mail at that address and listed it as her home address on documents related to a separate criminal proceeding. Beyond that, the parties presented very different versions of the extent of Ms. Myers's stay at her parents' home and the nature of her relationship with M.H.

¶ 7 Ms. Myers asserted at trial that she never lived at her parents' home but slept there only occasionally—"maybe once a month." Mr. Myers sought to contradict this view with the testimony of a private investigator, who saw Ms. Myers's car at her par-

ents' home four out of the five days he drove by the house in June 2007, including once early in the morning. The investigator also reported seeing Ms. Myers drive a young man fitting M.H.'s description to Independence High School, where M.H. was a student.

¶ 8 In her trial testimony, Ms. Myers denied the existence of a sexual relationship with M.H. There was no direct evidence to contradict her assertion. Mr. Myers admitted that he had no personal knowledge of a sexual relationship, and M.H. was never called to testify at trial. Yet Mr. Myers sought to undermine his ex-wife's testimony and to suggest the existence of a sexual relationship through circumstantial evidence.

¶ 9 Mr. Myers's evidence at trial on this point consisted principally of the testimony of the parties' children. A son and daughter of the Myerses submitted affidavits indicating that M.H. spoke of their mother as his "girlfriend," that the two of them frequently "flirt[ed] with each other," that they sometimes seemed jealous of each other, and that they acted like "boyfriend and girlfriend" in social settings. The son's affidavit also indicated that he once saw his mother pretending to be asleep on the couch while M.H. lay on the floor next to her. He also asserted that his mother once borrowed his car to visit M.H. after M.H. had moved to Salt Lake City, which she apparently used to drive to Salt Lake and to return the next morning. The parties' son equivocated on many of the points of his affidavit at trial, however, and acknowledged that he had no proof of a sexual relationship between his mother and M.H.

¶ 10 Based on this and other evidence presented at trial, the district court found that Ms. Myers "spent at least 80% of her nights at her parents' home" during this time, that her "residence during the spring and summer of 2007 was her parents' house," and that Ms. Myers and M.H. were "paired up" and "going together ... to events as a couple." The court also found that "[t]here was a sexual relationship between [Ms. Myers] and M.H.," expressly inferring that "from the common residency" of the two and the fact that Ms. Myers "elected to spend the night

with [M.H.] in Salt Lake City" (apparently the night she borrowed her son's car to drive there).

¶ 11 From these factual findings, the district court concluded that Ms. Myers and M.H. had a "common residency" in the late spring and summer of 2007. In light of that conclusion, the court shifted to Ms. Myers the "burden of proving a lack of sexual contact." Although Ms. Myers denied such contact in her testimony, the court concluded that she had failed to carry her burden, asserting that "her actions indicate otherwise." Given Ms. Myers's common residency and sexual relationship with M.H., the district court found that the two had cohabited under Utah Code section 30–3–5(10) and thus terminated Ms. Myers's alimony.

¶ 12 Ms. Myers appealed, and the court of appeals reversed. First, the court of appeals concluded that the district court had adopted "an unduly narrow view of cohabitation" by treating "common residency" and "sexual contact" as its only ingredients. *Myers v. Myers*, 2010 UT App 74, ¶ 17, 231 P.3d 815. It also ruled that the trial court had erred in shifting the burden of proof as to sexual contact to Ms. Myers, holding that the current version of the statute does not call for burden shifting. *Id.* ¶¶ 15, 18 n. 6. Ultimately, the court of appeals held that even if Ms. Myers and M.H. lived in the same household and had a sexual relationship, their relationship "bore little resemblance to a marriage." *Id.* ¶ 18. It accordingly reversed and reinstated Ms. Myers's right to alimony. We granted Mr. Myers's petition for writ of certiorari, and we now affirm.

II

¶ 13 On certiorari to this court, Mr. Myers challenges the decision of the court of appeals on two principal grounds. First, he argues that the court misconstrued the governing statute and ignored the gloss placed on it by our decision in *Haddow v. Haddow*, 707 P.2d 669 (Utah 1985). Second, Mr. Myers contends that the court gave inadequate deference to the trial court's findings of fact, which were supported by substantial evidence and sufficed to sustain the court's

termination of Mr. Myers's alimony obligation.

¶ 14 We disagree and affirm. On the first point, we endorse and elaborate on the legal standard articulated by the court of appeals as consistent with the statute and with *Haddow*. On the second issue, we conclude that the court of appeals gave proper deference to the district court's factual findings and uphold its decision to reverse the trial court's termination of Mr. Myers's alimony obligation under the law.

## A

¶ 15 In *Haddow* we construed a divorce decree that awarded the parties' home to Ingrid Haddow in lieu of alimony, subject to an equitable lien in favor of her ex-husband, John Haddow, of half of the equity in the home. *Haddow v. Haddow*, 707 P.2d 669 (Utah 1985). Under the decree, Mr. Haddow's equity was to be payable when "all of the children ceased to reside in the house or [Ms.] Haddow moved out of the house, remarried, or 'cohabited with a male person.'" *Id.* at 670. Our opinion in *Haddow* reversed the district court's conclusion that Ms. Haddow was cohabiting with another man and thus rejected the determination that Mr. Haddow was entitled to his equity in the home.

¶ 16 The *Haddow* opinion noted that the equitable lien in the divorce decree in that case was parallel to the then-governing statutory provision calling for termination of alimony when a "'former spouse is residing with a person of the opposite sex, unless it is further established by the person receiving alimony that the relationship ... is without any sexual contact.'" *Id.* at 672 (alteration in original) (quoting UTAH CODE ANN. § 30–3–5(3) (1985)). In reversing the trial court's finding of cohabitation, we defined the term to follow the meaning endorsed in "a majority of cases and statutes"—"'[t]o live together as husband and wife.'" *Id.* at 671 (quoting BLACK'S LAW DICTIONARY 236 (5th ed.1979); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 257 (1984)). We also distinguished cohabitation from mere visitation, noting that "[c]ohabitation is not a sojourn, nor a habit of visiting, nor even remaining with for a time;

the term implies continuity." *Id.* at 673 (internal quotation marks omitted). As we indicated in *Haddow*, two individuals can be deemed to be cohabiting only if they establish a "common abode that both parties consider their principal domicile for more than a temporary or brief period of time." *Id.* at 672.

¶ 17 Our opinion in *Haddow* also identified other hallmarks of cohabitation, including "participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife" and "the sharing of the financial obligations surrounding the maintenance of a household." *Id.* at 672–73. Yet we cautioned that these were merely factors in the ultimate inquiry into the existence of a relationship akin to that existing between husband and wife. We noted that "sexual contact, even if extensive, does not alone constitute cohabitation," and expressly declined to deem the sharing of financial obligations as a "requisite element of cohabitation." *Id.*

¶ 18 As we explained in *Haddow*, the then-governing statutory provision for termination of alimony "predicate[d] termination ... on a showing that the former spouse [was] 'residing' with a person of the opposite sex." *Id.* at 672 (quoting UTAH CODE ANN. § 30–3–5(3) (1953)). Under that provision, termination upon a finding of common residence was a rebuttable presumption, subject to reversal if the "recipient [could] show that the relationship [was] without sexual contact." *Id.* (internal quotation marks omitted).

¶ 19 The statute was amended by the legislature in 1995. *See* 1995 Utah Laws 1252–53. The amended provision substitutes "cohabiting" for "residing" and omits the concept of rebuttal by proof of a lack of sexual contact. Under the now-controlling statute, "[a]ny order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabiting with another person." UTAH CODE ANN. § 30–3–5(10) (Supp.2011).

¶ 20 Mr. Myers contends that the court of appeals misconstrued this provision in a way that failed to give adequate heed to our

decision in *Haddow*. Specifically, Mr. Myers asserts that the court erred in crediting a lack of shared financial obligations between Ms. Myers and M.H. and in declining to retain the rebuttal process adverted to in *Haddow*. We disagree. The court of appeals applied a legal standard that is consistent with the statute and the gloss on the term "cohabitation" provided in *Haddow*. It also correctly concluded that the rebuttal process noted in *Haddow* was overruled by the legislature in 1995.

1

■ ¶21 Ms. Myers can be deemed to have been "cohabiting" with M.H. only if they lived in a shared residence in a relationship akin to that of a husband and wife. *Haddow*, 707 P.2d at 672. We embraced this definition of cohabitation in *Haddow*, and the same conception of the term has been endorsed in parallel case law in many other jurisdictions.[1]

¶22 The standard applied by the court of appeals was fully consistent with this approach. That court properly recognized that the key question is "whether the parties entered into a relationship 'akin to that generally existing between husband and wife,'" *Myers v. Myers*, 2010 UT App 74, ¶17, 231 P.3d 815 (quoting *Haddow*, 707 P.2d at 672), and evaluated the relationship here by considering the nature and extent of Ms. Myers's and M.H.'s common residence, relationship, and interactions. Specifically, the court of appeals correctly considered the nature of the unusual living arrangements that Ms. Myers and M.H. found themselves in—that their stays in the same home overlapped, but that M.H. "shared an upstairs bedroom with one or more male roommates while [Ms. Myers] slept on a couch in the basement." *Id.* ¶18. It also properly examined the evidence of Ms. Myers's intimate relationship with M.H., acknowledging that they may have "shared a furtive sexual relationship" but concluding that their relationship "bore little resemblance to a marriage." *Id.*

¶23 We likewise endorse the court of appeals' further consideration of the question whether Ms. Myers and M.H. "establish[ed] a common household" in the sense of "shared expenses, shared decision-making, shared space, or shared meals." *Id.* As Mr. Myers notes, our decision in *Haddow* declined to treat such considerations as prerequisites to a finding of cohabitation. *See Haddow*, 707 P.2d at 673–74. But that does not make the sharing of household expenses and decisions irrelevant to the cohabitation inquiry. Our court and many others have routinely recognized such considerations as probative in this context.[2]

1. *See, e.g., Beck v. Beck*, 286 Ala. 692, 246 So.2d 420, 428 (1971) (defining cohabitation to encompass "many factors which are necessarily involved when a man and a woman dwell together as man and wife"); *State v. Arroyo*, 181 Conn. 426, 435 A.2d 967, 970 (1980) ("Cohabitation ... includes many facets of married life in addition to sexual relations."); *In re Marriage of Thornton*, 373 Ill.App.3d 200, 310 Ill.Dec. 789, 867 N.E.2d 102, 109 (2007) (defining cohabitation as "a *de facto* husband and wife relationship with a third party"); *Gordon v. Gordon*, 342 Md. 294, 675 A.2d 540, 547 (1996) ("[T]he ordinary definition of 'cohabitation' ... connotes mutual assumption of the duties and obligations associated with marriage."); *Konzelman v. Konzelman*, 158 N.J. 185, 729 A.2d 7, 16 (1999) ("Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage."); *Baker v. Baker*, 1997 N.D. 135, ¶13, 566 N.W.2d 806, 811 (defining "cohabitation" as "an informal marital relationship" (internal quotation marks omitted)); *Perri v. Perri*, 79 Ohio App.3d 845, 608 N.E.2d 790, 795 (1992) (defining "cohabitation"

as the assumption of "obligations equivalent to those arising from a ceremonial marriage"); *In re Marriage of Edwards*, 73 Or.App. 272, 698 P.2d 542, 547 (1985) ("'[C]ohabitation' ... refers to a domestic arrangement between a man and woman who are not married to each other, but who live as husband and wife....").

2. *See Haddow*, 707 P.2d at 673 ("Although we do not consider the sharing of the financial obligations surrounding the maintenance of a household to be a requisite element of cohabitation, we do find significant that Mr. Hudson did not pay any of appellant's living expenses or consistently share with her any of his assets."); *Ex Parte Ward*, 782 So.2d 1285, 1287 (Ala.2000) ("Factors which suggest some permanency of relationship include evidence that the former wife and alleged cohabitant occupied the same dwelling and shared household expenses." (internal quotation marks omitted)); *Linstroth v. Dorgan*, 2 So.3d 305, 307 (Fla.Dist.Ct.App.2008) (listing "financial interdependence" as a factor in determining cohabitation); *In re Marriage of Thornton*, 310 Ill.Dec. 789, 867 N.E.2d at 109 (listing "the

¶ 24 In considering these and other relevant factors, the court of appeals was properly acknowledging that a marriage-like cohabitation relationship is difficult to define with a hard-and-fast list of prerequisites. We cannot delineate a list of required elements of cohabitation because there is no single prototype of marriage that all married couples conform to. What we can do is identify general hallmarks of marriage (and thus cohabitation). Those hallmarks include a shared residence, an intimate relationship, and a common household involving shared expenses and shared decisions.[3] Because a cohabitation relationship is a relationship akin to a marriage, the court of appeals applied the correct standard in considering these factors in evaluating Ms. Myers's relationship with M.H.[4]

### 2

¶ 25 The court of appeals was also right to reject the rebuttal procedure set forth in *Haddow* on the ground that it has been displaced by statute. While the provision discussed in *Haddow* provided for rebuttal of alimony termination upon proof of a lack of "sexual contact," the amended version of the statute makes no mention of that procedure. Because the legislature has provided simply for termination of the duty to pay alimony "upon establishment by the party paying alimony that the former spouse is cohabiting with another person," UTAH CODE ANN. § 30-3-5(10), without reference to any other burden or rebuttal, the amended provision is properly construed to foreclose the notion of burden-shifting or rebuttal recognized in *Haddow.*

¶ 26 Mr. Myers challenges that conclusion on the ground that there is no indication in the relevant legislative history to indicate any intent to overrule the rebuttal procedure set forth in the statute discussed in *Haddow.* Because the legislative debate was addressed mainly to the need to remove a loophole—to clarify the fact that same-sex cohabitation could also trigger termination of alimony—Mr. Myers suggests that we ought to construe the amendment as aimed at that purpose alone and thus to preserve the burden-shifting rebuttal procedure referred to in *Haddow.*

¶ 27 This argument reflects a misunderstanding of the legislative process and of the judicial role in interpreting statutes. Legislation is rarely aimed at advancing a single objective at the expense of all others. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n. 6, 248 P.3d 465 (explaining "that most statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil"). More often, statutes are a result of a legislative give-and-take that balances multiple concerns. That is undoubtedly true of the 1995 amendment to the alimony termination provision, which we should presume to be aimed at addressing any and all issues affected by its text—whether or not they were the subject of

interrelation of [a couple's] personal affairs" as a factor in determining cohabitation); *State v. Kellogg*, 542 N.W.2d 514, 518 (Iowa 1996) (listing the "[s]haring of income or expenses" and the "[j]oint use or ownership of property" as factors in determining cohabitation); *Fisher v. Fisher*, 75 Md.App. 193, 540 A.2d 1165, 1169 (1988) (noting "shared assets and expenses" as a factor in determining cohabitation); *Konzelman*, 729 A.2d at 16 (indicators of cohabitation "can include ... intertwined finances such as joint bank accounts, sharing living expenses and household chores").

**3.** Courts in other jurisdictions have identified other factors that may also be relevant, such as the length and continuity of the relationship, the amount of time the couple spends together, the nature of the activities the couple engages in, and whether the couple spends vacations and holidays together. *See, e.g., Thornton*, 310 Ill.Dec.

789, 867 N.E.2d at 109–10; *Kellogg*, 542 N.W.2d at 518. We cite these considerations not as prerequisites or requirements, but again as part of the broader picture that might more completely inform the question whether a relationship resembles that of a married couple.

**4.** As the court of appeals noted, a cohabitation relationship is not necessarily the same thing as an unsolemnized marriage. *See Myers*, 2010 UT App 74, ¶ 17 n. 5, 231 P.3d 815. The latter requires that a couple "hold themselves out as and have acquired a uniform and general reputation as husband and wife." UTAH CODE ANN. § 30-1-4.5(1)(e). Cohabitation has nothing to do with the couple's reputation or with how they present themselves in public. It simply asks whether their relationship bears the hallmarks of marriage, as explained above.

some debate or discussion that was memorialized in the legislative history.

¶ 28 Our role in interpreting this statute is to read and interpret its text. *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 10, 175 P.3d 560. If that text is ambiguous, we may look to legislative history to inform our construction of the statutory language. *Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 15, 227 P.3d 256. But the legislative history is not law. It is at most of secondary relevance in informing our construction of the law, which is found in the statutory text. Where (as here) that text is unambiguous, it is neither troubling nor even relevant that the legislative history contains an elaboration of only some of its provisions. The 1995 amendment expressly omitted the language and structure that called for a burden-shifting rebuttal procedure, and it matters not at all that this change is not reflected in the legislative history.

¶ 29 Thus, there was no error in the court of appeals' conclusion that Ms. Myers had no burden of disproving sexual contact with M.H. The ultimate question in this case was whether Ms. Myers and M.H. were cohabiting, and Mr. Myers bore the burden on that issue. The existence of an intimate sexual relationship was relevant to the statutory inquiry, but Ms. Myers bore no specific burden of disproving it. Instead, it was Mr. Myers's burden to establish cohabitation by a preponderance of the evidence, and both parties were entitled to present—and did present—evidence that they deemed relevant to that inquiry.

¶ 30 At trial, Ms. Myers denied the existence of a sexual relationship with M.H. Mr. Myers acknowledged that he had no personal knowledge on the matter. His evidence consisted of his children's observations of their mother's and M.H.'s flirtatious and jealous behavior and the fact that Ms. Myers used her son's car to drive to Salt Lake to visit M.H. and to return the following morning. From this the trial court found that there was a sexual relationship, concluding that Ms. Myers had not "met her burden to establish lack of sexual contact."

¶ 31 The district court's assignment of the burden of proof to Ms. Myers was error, as the court of appeals indicated. Instead of asking whether Ms. Myers had carried the burden of disproving a sexual relationship, the trial court should have decided whether Mr. Myers had established cohabitation.[5] The court of appeals was right to resolve the case in that way, and we accordingly affirm.

## B

¶ 32 A district court's findings of fact are entitled to substantial deference on appeal. Questions of fact "entail[ ] the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind." *State v. Pena*, 869 P.2d 932, 935 (Utah 1994).[6] Since the lower court often has a comparative advantage in its firsthand access to factual evidence, and because there is no particular benefit in establishing settled appellate precedent on issues of fact, there is a potential downside and no significant upside to a fresh reexamination of the facts on appeal. Such findings are accordingly overturned only when "clearly erroneous." *See, e.g.*, *State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251.

---

5. The burden of proof is rarely decisive under a preponderance standard in any event, and it does not appear to have tipped the balance here. Such a burden is essentially a tie-breaker, which affects the outcome only if the court finds itself equally persuaded by both parties' submissions (or, alternatively, if there is no evidence from either side on the matter in question). *See United States v. Gigante*, 94 F.3d 53, 55–56 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses."). That does not seem to have been the basis for the district court's decision here, since both parties submitted evidence and the court ultimately found Mr. Myers's evidence "most credible." Thus, although the burden of proof applied by the district court was in error, it does not appear to have had a material effect on the trial court's conclusions in any event.

6. *See also* J. Thayer, A Preliminary Treatise on Evidence at the Common Law 191 (Boston: Little, Brown and Co. 1898) ("Nothing is a question of fact which is not a question of the existence, reality, truth of something; of the *rei veritas*.").

¶ 33 Mr. Myers challenges the court of appeals' treatment of the district court's findings as inconsistent with this standard. In his view, the court of appeals substituted its own view of the evidence for that of the district court, and did so without firsthand exposure to the testimony and evidence at trial. Specifically, Mr. Myers asserts that the district court made a series of findings that were improperly overturned on appeal— e.g., on Ms. Myers's and M.H.'s "common residency," on the existence of a sexual relationship between them, and on the extent of any shared expenses. Because these findings were not clearly erroneous, Mr. Myers contends that they should have been upheld on appeal and that they properly sustained the district court's order terminating his obligation to pay alimony to Ms. Myers.

¶ 34 We disagree. Some of the findings identified by Mr. Myers were pure findings of fact subject to clearly erroneous review. But some of those findings were premised on embedded questions of law, which are reviewed for correctness. And in our view, the court of appeals' decision gave proper deference to underlying findings of fact after first correcting the district court's misimpressions of the governing legal standards.

¶ 35 As Mr. Myers notes, the district court found that Ms. Myers and M.H. shared a "common residency" at the home of Ms. Myers's parents in Provo. From that conclusion, the district court also inferred the existence of a "sexual relationship" between the two—an inference that Ms. Myers failed to credibly rebut in the district court's view. These "findings" are not purely factual, however. The notion of "common residency" is a mixed question of law and fact,[7] and the court's resolution of these issues carried within them embedded legal conclusions that are reviewed for correctness on appeal.[8]

¶ 36 The district court's analysis of "common residency" and "sexual relationship" was based on a misconception of the governing legal standard. As noted above, a finding of "common residency" is no longer a threshold determination that shifts the burden of proof. Thus, when the court of appeals refused to defer to these findings as dispositive, it was simply clarifying the governing legal standards. It was not reweighing the evidence as Mr. Myers insists. The impact of common residency and of a sexual relationship on the determination of cohabitation are questions of law on which no deference is due, since they do not "call for proof" but rather for "argument."[9] We accordingly affirm the court of appeals' treatment of the district court's "findings" on these issues.

¶ 37 Mr. Myers is right to characterize other district court findings as purely factual. Such findings include the existence of a sexual relationship between Ms. Myers and M.H., the duration and nature of their residence at Ms. Myers's parents' home, and the degree to which they shared space or expenses in that household. But contrary to Mr. Myers's argument, the court of appeals deferred to and accepted these factual findings. The court of appeals' opinion expressly adopts the lower court's findings that Ms. Myers "spent 80% of her nights at her parents' home" at a time that "overlapped with M.H.'s stay [there] as a foster child," and that they "were romantically involved, were 'paired up' at social events, and apparently shared a furtive sexual relationship." *Myers v. Myers,* 2010 UT App 74, ¶ 18, 231 P.3d 815.

¶ 38 Thus, Mr. Myers's quarrel with the court of appeals ultimately comes down to a

7. See *Bustamante v. Bustamante,* 645 P.2d 40, 43 (Utah 1982) ("[T]he determination of residency ... is a mixed question of law and fact."); *see also State Farm Mut. Auto. Ins. Co. v. Colon,* 880 So.2d 782, 783 (Fla.Dist.Ct.App.2004) ("Residency in a household is a mixed question of law and fact to be determined based on the facts of each individual case.").

8. See *Barnard v. Sutliff,* 846 P.2d 1229, 1234 (Utah 1992) (while "findings of fact are reviewed under the clearly erroneous standard," "subsidiary legal conclusions are reviewed under the correction of error standard"); *see also Smith v. Holder,* 627 F.3d 427, 433 (1st Cir.2010) ("[W]e review embedded legal conclusions de novo...." (internal quotation marks omitted)).

9. Ronald R. Hofer, *Standards of Review—Looking Beyond the Labels,* 74 MARQ. L.REV. 231, 236 (1991); *see also State v. Pena,* 869 P.2d 932, 935 (Utah 1994) (defining questions of law to encompass "rules or principles uniformly applied to persons of similar qualities and status in similar circumstances").

disagreement with its mixed determination that the above facts did not amount to cohabitation. Since the district court's analysis of that mixed question was marred by its misconception of the governing legal standard, the court of appeals correctly declined to defer to it. Thus, the question before the court of appeals was simply whether to remand for further analysis under the proper legal standard or instead to render its own conclusion.

¶ 39 Under the circumstances, we see no reason for a remand and agree with the court of appeals' conclusion that Mr. Myers failed to establish cohabitation. The facts as found by the district court fall well short of establishing a cohabitation relationship. Even if Ms. Myers and M.H. had a sexual relationship and lived together under the same roof, their relationship had almost none of the other hallmarks of a marriage. Both of them were guests in the same home—one as an adult daughter sleeping on the couch, the other as a foster son sleeping in a bedroom with foster siblings. Their relationship may eventually have led to sexual intimacy, but that alone is insufficient to establish cohabitation. In the unique and unusual circumstances of this case, we agree with the court of appeals that whatever this relationship was, "it bore little resemblance to a marriage." *Id.*

## III

¶ 40 A spouse's alimony obligation terminates by statute only upon proof of a relationship amounting to cohabitation. In reversing the district court's finding of cohabitation in this case, the court of appeals applied the correct legal standard and gave proper deference to the district court's findings of fact. Its decision was correct, and we affirm it.

¶ 41 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice LEE's opinion.