2014 UT App 3

**Robert Keith LEVIN, Petitioner and Appellee,**

v.

**Hope M. CARLTON–LEVIN, Respondent and Appellant.**

**No. 20111023–CA.**

Court of Appeals of Utah.

Jan. 9, 2014.

Rodney R. Parker and Richard A. Van Wagoner, for Appellant.

Joshua K. Peterman and Bradley M. Strassberg, for Appellee.

Judge GREGORY K. ORME authored this Opinion, in which Judge STEPHEN L. ROTH concurred. Senior Judge RUSSELL W. BENCH concurred in the result.[1]

ORME, Judge:

¶1 Hope M. Carlton–Levin (Wife) appeals a trial court order reducing, and eventually terminating, her alimony based on a finding of cohabitation. We affirm.

## BACKGROUND

¶2 Robert Keith Levin (Husband) and Wife divorced in 2007. As part of the divorce decree, the trial court awarded Wife alimony for fourteen years and three months—the duration of the marriage.[2] The decree provided that Husband pay Wife $15,000 per month for five years, regardless of whether Wife remarried or cohabited. However, if during those five years Wife remarried or cohabited, her alimony would be reduced to $7,500 per month beginning in October 2012 and payments would terminate in October 2017.

¶3 In 2008, Husband began to suspect that Wife was cohabiting with Page Tucker at Wife's home in Grand Junction, Colorado. Based on these suspicions, Husband hired a private investigator to track the movements of Wife and Tucker from June 18 to August 8, 2009, in large part by monitoring the movements of Tucker's Ford Explorer by means of a GPS tracking unit. Husband then filed a motion requesting that the trial court determine that Wife and Tucker were cohabiting and that alimony should therefore be reduced and then terminated in accordance with the schedule the court had established in the divorce decree. Wife and Tucker, then unaware that the Explorer's movements had been tracked, filed responsive affidavits stating that Tucker hardly ever drove his Explorer during the summer of 2009 and that it had merely been parked at Wife's home because he needed somewhere to park it. Both Wife and Tucker also denied that they were living together but alleged that Tucker was instead sharing a home with his brother during the surveillance period.

¶4 At trial, Husband presented the private investigator's GPS evidence, which indicated that Tucker's Explorer was parked overnight at Wife's home for fifty-one of the fifty-two nights that it was tracked. The GPS evidence also indicated that the Explorer was driven regularly throughout those fifty-two days. The private investigator also testified and introduced summaries of the raw GPS data which described three basic patterns of movement for the Explorer:

---

1. Wife challenged the amount of alimony and other aspects of the divorce decree in a prior appeal. *See Levin v. Carlton,* 2009 UT App 170, 213 P.3d 884. We affirmed and awarded Husband attorney fees incurred on appeal. *See id.* ¶32.

2. Because the statutory provisions in effect at the relevant time do not differ in any way material to our analysis from those now in effect, we cite the current version of the Utah Code as a convenience to the reader.

a. For twenty-four (24) days it went to [Tucker's] gym first thing in the morning, then to [Tucker's] work, then back to [Wife's] home, where it remained overnight.

b. For fifteen (15) days it went to [Tucker's] work, followed by a brief stop at [his brother's] home, then back to [Wife's] home, where it remained overnight.

c. For twelve (12) days, mostly on weekends, it went to various locations and then came back to [Wife's] home.

¶ 5 After the investigator presented this evidence, both Wife and Tucker admitted that they had not been truthful in their affidavits about the usage of the Explorer. They also admitted that Tucker had driven the Explorer and claimed that they made untruthful statements about the Explorer's usage only because it was not properly licensed and registered during the summer of 2009. The trial court, however, did not believe this explanation, perhaps finding it incredible that one would risk contempt sanctions, or even a perjury conviction, in an effort to conceal a lapse in a vehicle's registration. As a result, the trial court "determined not to believe the testimony of either [Tucker] or [Wife], where it conflicts with other evidence," and added that "their testimony has been disregarded by the Court."

¶ 6 In addition to the GPS tracking data, the trial court received evidence from a number of other sources, including testimony from several witnesses, phone records, credit card records, records of purchases at various stores and email exchanges. The phone records included cell phone records, which were used to determine the location of the parties at various times based on the locations from which their cell phone calls originated.

¶ 7 Based on this evidence, the trial court found that "Tucker commenced using [Wife's] Grand Junction, Colorado home as his personal residence at about the time [Wife] moved [there] ... in June, 2008." Additionally, the court found that during this time Tucker and Wife "were purchasing food and household items together," Tucker "contributed cash to the purchase of groceries that were then prepared and consumed" by both Wife and Tucker, and Tucker "provided assistance in the care and upkeep of [Wife's] home." The court also found that Wife and Tucker "maintained a common residence, in which [Tucker] was free to come and go, whether or not [Wife] was present"; they "shared meals and traveled together"; they had "a physically intimate relationship"; and "[w]hile there was no direct evidence about where [Tucker] kept his clothes," based on the GPS evidence about his day-to-day movement "it would have been extremely inconvenient for him to keep his wardrobe in the home he supposedly shared with his brother." The court also found it noteworthy that when Wife "had matters which were stressful for her, such as meetings with lawyers, she took [Tucker] with her. She looked to [Tucker] for emotional support as well as assistance in dealing with financial matters with respect to which she considered him to be more capable than was she."

¶ 8 Based on these findings of fact, the court concluded that Wife and Tucker "were thus cohabiting within the meaning of § 30–3–5(10) of the Utah Code" and ordered that Wife's "alimony should be reduced and ultimately terminated in accordance with the schedule the Court established for that eventuality." The court then awarded Husband attorney fees as the prevailing party but reserved the discretion to reduce those fees if paying the full amount would be too burdensome for Wife. Wife appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Wife challenges the trial court's cohabitation determination. "Whether cohabitation exists is a mixed question of fact and law. While we defer to the trial court's factual findings unless they are shown to be clearly erroneous, we review its ultimate conclusion for correctness." *Jensen v. Jensen*, 2007 UT App 377, ¶ 2, 173 P.3d 223 (citation and internal quotation marks omitted).

## ANALYSIS

¶ 10 Under Utah law, unless otherwise provided in the divorce decree, alimony "terminates upon establishment by the party paying alimony that the former spouse is

cohabitating with another person." *See* Utah Code Ann. § 30–3–5(10) (LexisNexis 2013).[3] That a couple is living in the same house, even if they are physically intimate, does not automatically mean there is cohabitation for purposes of this statute. *See Myers v. Myers*, 2011 UT 65, ¶ 39, 266 P.3d 806. The key is whether the arrangement is akin to marriage, and "[w]hether a relationship bears the hallmarks of a marriage-like cohabitation is a fact-intensive inquiry." *Cox v. Cox*, 2012 UT App 225, ¶ 15, 285 P.3d 791. *See also Myers*, 2011 UT 65, ¶ 24, 266 P.3d 806 ("[A] marriage-like cohabitation relationship is difficult to define with a hard-and-fast list of prerequisites."). As a result, the burden of establishing that cohabitation has occurred is on the payor spouse. *See* Utah Code Ann. § 30–3–5(10) (stating that "alimony to a former spouse terminates upon establishment *by the party paying alimony* that the former spouse is cohabitating with another person") (emphasis added). Here, the trial court concluded that Husband had met his burden. We agree.

## I. We Accept the Trial Court's Factual Findings.

¶ 11 There is some debate among the parties about whether Wife properly marshaled the evidence supporting the factual findings that she resists. *See generally Chen v. Stewart*, 2004 UT 82, ¶ 77, 100 P.3d 1177 (holding that "appellants must provide a precisely focused summary of all the evidence supporting the findings they challenge . . . and then convince us that the trial court erred in the assessment of that evidence to its findings"). However, Wife concedes that her challenge is not to the evidentiary foundation for the factual findings, but "to the legal conclusion the fact-finding is alleged to support." Therefore, we turn to consider the findings made by the trial court. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n. 5, 217 P.3d 733.

¶ 12 "A trial court's findings of fact will not be set aside unless clearly errone-

ous." *Chen*, 2004 UT 82, ¶ 19, 100 P.3d 1177. And "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). Here, while the trial court did draw some inferences to support its ultimate findings, it went to great lengths to fully present and explain its findings of fact in its comprehensive, detailed ruling. That another fact-finder might have reached different factual findings based on the evidence presented does not render the trial court's findings clearly erroneous. *See Kimball*, 2009 UT App 233, ¶ 20 n. 5, 217 P.3d 733 ("No matter what contrary facts might have been found from all the evidence, our deference to the trial court's pre-eminent role as fact-finder requires us to take the findings of fact as our starting point.").

¶ 13 We do not always have the benefit of knowing a trial court's assessment of credibility, other than by inference. In this case, however, in fully spelling out its findings, the trial court expressly detailed the basis for its key credibility determinations, explaining, with our emphasis, as follows:

> The Court finds that [Tucker and Wife] lied initially in their affidavits in order to deceive the Court about where [Tucker] was living. The Court also found they continued to lie in their testimony before the Court in an effort to deceive the Court about the motivation for their initial lies. As a result, the Court determined not to believe the testimony of either [Tucker or Wife], where it conflicts with other evidence, *and their testimony has been disregarded by the Court.*

The trial court carefully outlined its factual findings in a detailed written ruling authored by the court itself. It explained the evidentiary bases for its findings and explicitly outlined the reasoning for its key credibility determinations. We defer to the trial court's advantaged role as fact-finder and accept, for purposes of our review, the facts as stated in its ruling.

---

3. This more contemporary statement of the applicable cohabitation inquiry, found in *Myers*, does not replace the framework introduced in *Haddow v. Haddow*, 707 P.2d 669, 672–74 (Utah 1985), but is a more reliable template in light of the ever-evolving and heterogeneous nature of marriage and marriage-like relationships in modern society.

## II. Wife and Tucker Were Cohabiting.

¶ 14 Based on its factual findings, the trial court concluded that Wife and Tucker "were thus cohabiting within the meaning of § 30-3-5(10) of the Utah Code." Wife contends that the evidence when taken as a whole does "not support the legal conclusion that the two had established a relationship akin to husband and wife."

■ ¶ 15 The Utah Supreme Court has never "delineate[d] a list of required elements of cohabitation because there is no single prototype of marriage that all married couples conform to." *Myers v. Myers,* 2011 UT 65, ¶ 24, 266 P.3d 806. What Utah courts have done "is identify general hallmarks of marriage" (and thus cohabitation). "Those hallmarks include a shared residence, an intimate relationship, and a common household" involving shared expenses, shared decisions, shared space, and shared meals. *Id.* ¶¶ 23-24. There are a number of other possible factors "that might more completely inform the question whether a relationship resembles that of a married couple," such as "the length and continuity of the relationship, the amount of time the couple spends together, the nature of the activities the couple engages in, and whether the couple spends vacations and holidays together." *Id.* ¶ 24 n. 3.[4]

¶ 16 In this case, the trial court made findings supporting each of the hallmarks of marriage-like cohabitation. Specifically, the court found that Wife and Tucker shared a common residence that Tucker entered and exited at his leisure and treated as his own home; they had a sexual relationship; and they maintained a common household, including sharing meals, sharing responsibility in care and upkeep of the home, sharing in living expenses, and keeping clothing in the same home. The court also found it probative that when Wife "had matters which were stressful for her, such as a meeting with lawyers, she took [Tucker] with her. She looked to [Tucker] for emotional support as well as assistance in dealing with financial matters with respect to which she considered him to be more capable than was she." Es-

pecially in view of the trial court's careful consideration of the hallmarks of cohabitation and other relevant factors to inform the question of whether Wife and Tucker's relationship resembles that of a married couple, we agree that the evidence supports the trial court's conclusion that Wife and Tucker were cohabiting.

■ ¶ 17 Despite the trial court's thorough ruling, however, Wife maintains that in this case the "period of observation was too short to establish that the relationship was characterized by the permanency characteristic of a husband and wife relationship." *See Haddow v. Haddow,* 707 P.2d 669, 673 (Utah 1985) ("Cohabitation is not a sojourn, nor a habit of visiting, nor even remaining with for a time; the term implies continuity.") (citations and internal quotation marks omitted). She contends that the short period of surveillance by the private investigator was "insufficient as a matter of law" to support the trial court's legal conclusion of cohabitation. However, the trial court does not appear to have viewed this evidence in isolation. Indeed, the court found that based on the totality of the evidence presented, "Tucker commenced using [Wife's] Grand Junction, Colorado home as his personal residence at about the time [Wife] moved [there] ... in June, 2008," a period of time far exceeding the short observation period that was the subject of the private investigator's intense scrutiny. Therefore, it is evident that the court viewed the fifty-two-day observation window in 2009 as being merely representative of a longer trend in the relationship of Wife and Tucker stretching back to the summer of 2008 and not as constituting the entirety of their relationship.

### III. Husband Is Entitled to Attorney Fees.

■ ¶ 18 Husband was awarded attorney fees below. "The general rule is that when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Robertson's Marine, Inc. v. I4 Solu-*

4. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11-201(6).

*tions, Inc.*, 2010 UT App 9, ¶ 8, 223 P.3d 1141 (citation and internal quotation marks omitted). Husband is therefore entitled to an award of fees reasonably incurred on appeal as well as those awarded by the trial court. We remand to the trial court for a calculation of such fees. In calculating Husband's award of attorney fees incurred on appeal, however, the trial court should take into account the extra twists and turns in this case resulting from Wife's bankruptcy filing, as not all fees incurred will be attributable to this appeal. And we express no opinion on the calculation or recoverability of attorney fees insofar as the same may be limited or precluded by Wife's bankruptcy case.

## CONCLUSION

¶ 19 The trial court went to great lengths to carefully articulate the reasoning behind its findings of fact and credibility determinations, and we accept those findings on appeal. We also conclude that the trial court's findings of fact fully support its conclusion that Wife and Tucker were cohabiting. We therefore affirm the trial court's order and remand to the trial court to determine an award of attorney fees reasonably incurred on appeal, subject to the reservations expressed above.