2016 UT App 31

# THE UTAH COURT OF APPEALS

JILLIAN SCOTT,
Appellant,
*v.*
BRADLEY SCOTT,
Appellee.

Opinion
No. 20131122-CA
Filed February 19, 2016

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 124903563

Michael D. Zimmerman, Julie J. Nelson, Bart J.
Johnsen, and Melissa M. Bean, Attorneys
for Appellant

Karra J. Porter and Kristen C. Kiburtz, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
KATE A. TOOMEY and SENIOR JUDGE JAMES Z. DAVIS concurred.[1]

ROTH, Judge:

¶1     The district court granted Bradley Scott's (Husband) motion to terminate his alimony obligation to Jillian Scott (Wife) on the ground that she had cohabited with J.O., with whom she

---

1. Senior Judge James Z. Davis began his work on this case as a member of the Utah Court of Appeals. He retired from the court, but thereafter became a Senior Judge. He completed his work on this case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

had maintained a long-term relationship. We affirm the district court's conclusion that cohabitation occurred, but we adjust its determination regarding the date that cohabitation began and remand for the court to recalculate the amount of alimony to be recouped by Husband.

BACKGROUND

¶2     As part of their 2006 divorce, Husband agreed to pay Wife $6,000 per month in alimony. The decree of divorce provided that alimony was to continue "for the duration equal to the number of years that the parties' marriage existed" (approximately twenty-seven years) but would terminate "upon the remarriage or cohabitation of [Wife] or upon the death of either party." *See generally* Utah Code Ann. § 30-3-5(9), (10) (LexisNexis Supp. 2014).

¶3     In October 2008, Wife began dating J.O. They had an "intimate and exclusive" "long-term" relationship until J.O. suddenly ended it in April 2011. In October 2011, Husband filed a petition to terminate alimony on the basis that Wife had "cohabited with an adult male . . . commencing on or about February 2011." After an evidentiary hearing, the district court determined that Wife and J.O. began cohabiting on December 22, 2010, and terminated alimony as of that date. The court awarded Husband a judgment against Wife for $211,742 to reimburse the alimony he had paid since the termination date.

¶4     The court based its cohabitation decision on evidence adduced at the hearing. Until the final six weeks or so of their thirty-one-month relationship, Wife and J.O. maintained separate homes in Salt Lake City, where each resided while in Salt Lake City. J.O., however, owned or had use of two vacation homes, one in Sun Valley, Idaho, and the other in Scottsdale, Arizona. During the relationship, the couple took thirty-six trips together, often "stay[ing] in [J.O.'s] various homes" for a week or

more at a time. Wife stored personal items at the vacation homes and had unfettered access to them while there.

¶5    In July 2010, Wife began exploring the possibility of purchasing a house in California and planned a trip to Rancho Santa Fe in hopes that J.O. would "fall in love with it so [they] could have a home there." By September 2010, the couple planned to "purchase . . . the Rancho Santa Fe home for the two of them." Although Wife originally intended to finance the purchase with proceeds from the sale of her Salt Lake City residence and another piece of property, neither property sold, and J.O. paid for the Rancho Santa Fe house. The sale closed in January 2011.

¶6    The district court made findings regarding several events it found significant that occurred in the months leading up to the house purchase. First, in late summer 2010, "[J.O.] proposed marriage to [Wife]," and she accepted. On December 22, 2010, Wife and J.O. traveled to J.O.'s Sun Valley vacation home where they spent Christmas together with Wife's daughter. And in January 2011, the couple took a twenty-five-day cruise to celebrate J.O.'s retirement. Finally, upon returning to Salt Lake City from the cruise, the couple spent only a couple of weeks preparing for the move before they "physically moved into the Rancho Santa Fe home on February 17, 2011." In determining that Wife and J.O. had both changed their primary residence from Salt Lake City to Rancho Santa Fe, the court considered it significant that Wife had hired movers to transport her household belongings to California, that J.O. had arranged to have his vehicle shipped to California, and that J.O. had also arranged to have his and Wife's "computers, linens and whatever clothes they wanted" transported there on a private plane. Further, immediately upon arriving in Rancho Santa Fe, J.O. joined a golf club, where he filled out a form that listed Wife as having "Family Status," which, according to the document itself, constituted a representation that they were "living together and maintaining a common household." A friend also

testified that she had visited J.O. and Wife after they had moved to Rancho Santa Fe and described the new house as "their home."

¶7     The couple's relationship ended abruptly on about April 1, 2011, when J.O. broke off the relationship and returned to Salt Lake City. Soon after, Wife agreed to move out of the Rancho Santa Fe house, and the parties negotiated a settlement agreement under which J.O. paid Wife $110,000 to "give him a release of [any] claims" she may have had against him.

## ISSUES AND STANDARDS OF REVIEW

¶8     Wife appeals the district court's decisions to terminate alimony and to order her to return $211,742 in alimony payments received on or after December 22, 2010. "Whether cohabitation exists is a mixed question of fact and law." *Myers v. Myers* (*Myers I*), 2010 UT App 74, ¶ 10, 231 P.3d 815 (citation and internal quotation marks omitted), *aff'd*, *Myers v. Myers* (*Myers II*), 2011 UT 65, 266 P.3d 806. Because Wife does not challenge the court's findings of fact but instead contends only that the court failed to analyze the facts under the proper legal standard, we review the court's "ultimate [cohabitation] conclusion for correctness." *See id.* (citation and internal quotation marks omitted). We review the judgment reimbursing Husband for alimony paid while Wife was cohabiting for abuse of discretion. *See Black v. Black*, 2008 UT App 465, ¶¶ 11, 13, 199 P.3d 371.

## ANALYSIS

¶9     The Utah statute governing cohabitation following divorce (the Cohabitation Provision) provides, "Any order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person." Utah Code Ann. § 30-3-5(10) (LexisNexis Supp. 2014). Wife contends that the

district court erred in a number of ways in its legal application of this provision.[2]

## I. Cohabitation

A.    The District Court Properly Concluded That There Was Cohabitation, but Cohabitation Did Not Begin as Early as the Court Determined.

¶10    Wife contends that the district court erred in concluding that she and J.O. cohabited. *See id.* Specifically, Wife asserts that she and J.O. did not establish a common residency. Cohabitation occurs when a couple establishes a common residency and engages in a "relatively permanent sexual relationship akin to that generally existing between husband and wife." *Myers II*, 2011 UT 65, ¶¶ 16–17 (quoting *Haddow v. Haddow*, 707 P.2d 669, 672–73 (Utah 1985)); *see also Levin v. Carlton-Levin*, 2014 UT App 3, ¶ 10 & n.3, 318 P.3d 1177 (explaining that cohabitation involves living together and being sexually intimate under circumstances "akin to marriage"). Because there is no dispute that Wife and J.O. engaged in a "relatively permanent sexual relationship" lasting for more than two years, *see Myers II*, 2011 UT 65, ¶ 17 (citation and internal quotation marks omitted), we focus on whether the district court's findings support its conclusion that Wife and J.O. cohabited as of December 22, 2010. We agree with the district court that Wife and J.O. established a common residency, but we conclude that cohabitation did not

---

2. The parties' decree of divorce differs from the language contained in Utah Code section 30-3-5(10). The decree provides that Wife's alimony award "shall terminate upon the . . . cohabitation of [Wife]." However, the parties have presented this case as though the statutory language governs the result, and for purposes of this analysis we assume that the parties' decree is substantively identical to the statute on the issue of cohabitation.

begin until February 17, 2011, when they moved into the Rancho Santa Fe house together.

¶11 "Common residency" is "not a sojourn, nor a habit of visiting, nor even remaining with for a time; the term implies continuity." *Id.* ¶ 16 (citation and internal quotation marks omitted). Thus, the phrase requires that the parties "[(i)] establish a 'common abode [(ii)] that both parties consider their principal domicile [(iii)] for more than a temporary or brief period of time.'" *Id.* (quoting *Haddow*, 707 P.2d at 672). We address each element of the common residency test in turn.

1.     Common Abode

¶12 We first consider whether the parties "establish[ed] a common abode." *See id.* (citation and internal quotation marks omitted). The district court found that Wife and J.O. shared a residence from December 22, 2010, through April 1, 2011, because during that time, the parties had actively begun plans to move in together, their time spent together had escalated to nearly full time, and by February 17, 2011, the parties had moved into the Rancho Santa Fe house together. Wife contends that the court erred when it concluded that she and J.O. established a common abode. In particular, she asserts that between December 22, 2010 and April 1, 2011, she and J.O. stayed either in their separate Salt Lake City homes or in vacation homes and that a "choppy sequence of visits to different places does not make an 'abode.'"

¶13 But the court made ample factual findings to support a conclusion that Wife and J.O. shared a common abode as of February 17, 2011, when they moved to Rancho Santa Fe, California. In anticipation of moving from Salt Lake City, Wife hired movers to pack up all of her household belongings and transport them to Rancho Santa Fe. J.O. also made arrangements to have their personal belongings, including his vehicle, and his and Wife's computers, linens, and clothing, either shipped to

California or transported by private plane. The pair purchased a couch to furnish the Rancho Santa Fe house. The sharing of household expenses and keeping of clothing and other personal items in a joint location are indicators of common residency. *See Sigg v. Sigg*, 905 P.2d 908, 918 (Utah Ct. App. 1995). Furthermore, upon arriving in California, J.O. joined a golf club, where he filled out a form that listed Wife as having "Family Status," which, according to the document itself, amounted to a representation that she and J.O. were "living together and maintaining a common household."[3] A friend also testified that J.O. and Wife had purchased and moved into the Rancho Santa Fe house together.[4]

¶14    Whether the findings legally justify a determination that Wife and J.O. resided together between December 22, 2010, and February 17, 2011, however, is a closer question. The findings certainly support a determination that the couple increased the amount of time spent together (including the number of overnight visits) during this time period. But other than increased time together, Wife and J.O. behaved in the

---

3. The court also found that after Wife moved out of the house following the couple's breakup, J.O. rescinded Wife's Family Status. This finding lends further support to the conclusion that J.O. and Wife modified their relationship status when they moved to Rancho Santa Fe.

4. In its findings, the district court set forth much of the witnesses' testimonies, including some statements that do not support the court's ultimate conclusion that the parties had cohabited. After the court set forth its 122 findings of fact, however, it then conducted an analysis where it identified which evidence supported its conclusions. Therefore, we have interpreted the court's numbered findings as simply identifying the information before it and its analysis about cohabitation as identifying the evidence it found pertinent and credible.

relationship as they had from its inception. Wife and J.O. had traveled frequently throughout their thirty-one-month relationship, often visiting one of J.O.'s vacation homes for a week or more at a time. But the couple did not continuously occupy any vacation home. *Cf. Myers II*, 2011 UT 65, ¶ 16, 266 P.3d 806 (observing that the term common residency "implies continuity" (citation and internal quotation marks omitted)). Indeed, Wife and J.O. maintained separate residences in Salt Lake City, where they returned at the end of each vacation.[5] Although Wife and J.O. shared meals and other expenses during their travels and Wife stored some of her personal belongings at J.O.'s Sun Valley vacation home, those activities appear to have been motivated primarily by convenience related to travel rather than an intention to share a common residence. More

---

5. We make this distinction in the context of the facts of this case. In doing so, we are not foreclosing the possibility that a couple who gives up permanent residence in favor of a lifestyle of travel could be considered to be cohabiting, even if the couple never settles in a particular place with the intention of remaining. Indeed, an argument could be made that a couple living a nomadic life where they maintain no permanent abode, but intend to be together wherever they happen to be, could be cohabiting even if they had no permanent place of residence. As we have frequently observed, whether a particular couple is cohabiting is a fact-intensive inquiry to be made on a case-by-case basis. *See, e.g.*, *Levin v. Carlton-Levin*, 2014 UT App 3, ¶ 10, 318 P.3d 1177; *Cox v. Cox*, 2012 UT App 225, ¶ 15, 285 P.3d 791.

We do not believe the circumstances of this case would support such a conclusion, however. While Husband argues that the pattern of frequent stays in vacation homes is the way wealthy people live together, Wife contends that it is the way wealthy people vacation together. For reasons discussed in our analysis, we do not believe that Wife and J.O.'s vacation-intensive relationship rose to the level of cohabitation before they moved into the Rancho Santa Fe house together.

importantly, while the amount of time Wife and J.O. spent together between December 22 and February 17 increased, the fundamental nature of their relationship remained the same. The increase in their time together appears to be the result of timing and circumstances—specifically the coincidence of the Christmas and New Year's holidays when couples, even those who are only dating, often travel together—with the ensuing celebration cruise marking J.O.'s transition into retirement. That Wife and J.O. were making plans to move in together at this time does not transform their future intent into present reality.

¶15    Accordingly, we conclude that the findings do not support the district court's conclusion that cohabitation occurred as of December 22, 2010. Instead, it appears that Wife and J.O. "establish[ed] a common abode" beginning on February 17, 2011, when they moved into the Rancho Santa Fe house together, and ending on April 1, 2011, when the relationship ended and J.O. moved out. *See id.*

2.    Principal Domicile

¶16    Wife next argues that the district court erred by concluding that she and J.O. shared a principal domicile. She contends that even though "domicile" has not been specifically defined in the context of cohabitation, we should seek guidance from other areas of law, such as the tax code, which employs a "totality of the circumstances test." She also asserts that the circumstances in this case do not support a conclusion that she and J.O. had established a principal domicile where each had "their own principal domicile in Salt Lake City" and neither of them "considered any of the vacation destinations to be their principal domicile."

¶17    We are not persuaded, however, that the concept of "domicile," as that term is employed either in the tax code or in the determination of divorce jurisdiction, can be imported wholesale into the context of alimony-related cohabitation.

Indeed, the Cohabitation Provision does not use the term domicile; rather, it refers only to "cohabitating." Utah Code Ann. § 30-3-5(10) (LexisNexis Supp. 2014). The term "cohabitating" is not statutorily defined, but judicial usage of the term as well as corresponding references to "domicile" in our case law suggest that the legislature did not intend the residency component of cohabitation to be so rigid as to be satisfied only if each member of the couple intends their common residence to be his or her sole and permanent residence. For example, in *Haddow v. Haddow*, 707 P.2d 669 (Utah 1985), where the residency requirement of cohabitation was first defined, the Utah Supreme Court spoke in terms of a "principal domicile." *See id.* at 672. "Principal" generally means "[c]hief; primary; [or] most important." *Black's Law Dictionary* 1312 (9th ed. 2009). The use of the qualifier "principal" thus seems to recognize that a cohabiting couple may have a second residence or another place that each considers to be his or her permanent home but that if the couple is residing together primarily in one place for some amount of time, then the common residency requirement has been satisfied.

¶18    And this approach is consistent with how the common residency requirement has been treated in our subsequent cohabitation cases. In *Sigg v. Sigg*, 905 P.2d 908 (Utah Ct. App. 1995), for example, we upheld the trial court's determination that a couple who lived in separate condominiums in the same complex began cohabiting once they maintained "open access to each other's condominiums, ate together and shared food expenses, kept clothing in the same condominium, used the same furniture and otherwise lived as though they were husband and wife." *Id.* at 918 (internal quotation marks omitted). In so doing, we did not apply a rigid one-domicile approach along the lines proposed by Wife but instead looked more generally at whether the couple lived together in the sense of establishing a common residence—in that case consisting of two places they occupied together. Thus, although the couple in *Sigg* maintained ownership of separate residences, we considered it

significant that the couple lived together in both residences. We took a similar approach in *Levin v. Carlton-Levin*, 2014 UT App 3, 318 P.3d 1177. There, we focused on whether the evidence demonstrated that the ex-wife's boyfriend was living at her home in Colorado in the ordinary sense, *see Lilly v. Lilly*, 2011 UT App 53, ¶ 13, 250 P.3d 994 (defining "residence" as "[t]he place where one actually lives" (alteration in original) (citation and internal quotation marks omitted)), not whether he intended that home to be his domicile, as that term is legally defined in other areas of the law, *see Levin*, 2014 UT App 3, ¶¶ 15–16.

¶19    In other words, the concept of residence or domicile in the cohabitation context seems focused on the nature of the couple's living arrangements as it reflects the individuals' commitment to each other. But the concept of legal residence or domicile in the cases Wife cites is focused on something different—the relationship of a person to a place. In that context, the concept of residence or domicile focuses more on the reach of local government, whether in terms of eligibility for benefits, such as resident tuition or fishing licenses; access to the courts for divorce or other proceedings; imposition of legal obligations such as taxes; or the concomitants of citizenship, such as the right to vote in local elections. Accordingly, we are not persuaded that there is a justification for deviating from our precedent treating "principal domicile" as meaning the place in which two people intend to live together in an intimate relationship. We now turn to the question of whether the district court's findings support a determination that the Rancho Santa Fe house was Wife's and J.O.'s "principal domicile" in the cohabitation context.

¶20    The district court found that "obtaining . . . the Rancho Santa Fe home was a joint effort by [J.O.] and [Wife]" that further established their relationship as "akin to [that of] a husband and wife" in advance of their intended marriage. The court bolstered these findings with additional findings regarding Wife's and J.O.'s subjective intent. The court found that Wife and

J.O. "physically moved" to California on February 17, 2011. The court cited Wife's decisions to sell all her Utah real property and to transport her household and personal belongings to California, as well as Wife's own statements—that she and J.O. purchased the house in Rancho Santa Fe to "grow old" together and that she was "excited" to "finally [be] back in California . . . where [she] want[ed] to be"—as evidence that she intended the Rancho Santa Fe house to be her principal domicile. According to the district court, "[i]t is clear from [Wife's] own writings that she considered [the Rancho Santa Fe house] to be her home. In fact, it was her 'dream home.'" A friend's testimony that Wife had furnished the house with her household belongings further corroborated that Wife had made the Rancho Santa Fe house her principal domicile. The court reached the same conclusion with respect to J.O. Although the court noted J.O.'s testimony that "Rancho Santa Fe was not intended to be his primary residence," the court apparently found this testimony belied by J.O.'s marriage proposal to Wife, Wife's testimony that she and J.O. both "hated Salt Lake and wanted to live in Rancho Santa Fe," Wife's attempt to sell her real estate in Utah and to change her principal residence to California, and J.O.'s own efforts to transport his possessions to the Rancho Santa Fe house. In other words, the district court's undisputed findings support a determination that both Wife and J.O. intended the Rancho Santa Fe house to be their principal domicile for purposes of the cohabitation analysis, i.e., that they intended to live there together in a marriage-like arrangement.

3.     More than a Temporary or Brief Period of Time

¶21    Finally, we turn to the third component of the common residency analysis: whether the couple established a common residence "for more than a temporary or brief period of time." *Myers II*, 2011 UT 65, ¶ 16, 266 P.3d 806 (citation and internal quotation marks omitted). Wife contends that even if she and J.O. established a common abode that they both considered to be their principal domicile, they did not, as a matter of law, reside

in the Rancho Santa Fe house for "more than a temporary or brief period of time." *See id.* (citation and internal quotation marks omitted).

¶22 Our case law has not established a bright-line rule for what constitutes "a temporary or brief period of time." Using ordinary definitions of those terms, we conclude that "temporary" focuses more on the couple's state of mind—that is, whether moving in together is motivated or accompanied by a desire to operate as a couple for the foreseeable future or is simply an expedient arrangement with no enduring quality— while "brief" refers to the duration of the stay. *Compare Temporary*, Merriam–Webster Online, (Jan. 28, 2016), http://www.merriam-webster.com/dictionary/temporary [https://perma.cc/RER4-LF2W] (defining "temporary" as "not permanent" or "intended to be used for a limited amount of time"), *with Brief*, Merriam–Webster Online, (Jan. 28, 2016), http://www.merriam-webster.com/dictionary/brief [https://perma.cc/5YC8-NER9] (defining "brief" as "short in duration, extent, or length"). That the two terms are contained in a single phrase, however, suggests that they do not operate entirely independently of each other. The Utah Supreme Court's cohabitation discussion in *Knuteson v. Knuteson*, 619 P.2d 1387 (Utah 1980), helps illustrate how these concepts interrelate.

¶23 In *Knuteson*, the ex-wife (the recipient of alimony) temporarily moved in with her male neighbor after her ex-husband became "considerably in arrears in his alimony payments" and left her "nearly destitute" and without funds to make utility payments. *Id.* at 1388. During her "two months and ten days" stay with the neighbor, the ex-wife and the neighbor began a sexual relationship. *Id.* During this period, however, the ex-wife managed to "garnish[] her prior spouse's funds, and obtain[] some money in record time" so that she could quickly move back into her own home. *Id.* The supreme court determined that the ex-wife never intended to permanently reside with the neighbor but did so only to deal with the

circumstances brought on by her ex-husband's decision to "flout[] the interdiction of the court." *Id.* at 1389. Her stay at the neighbor's house was brief, just over two months, during which time the ex-wife "expended much of her efforts in the daytime at her own home doing chores and yard work." *Id.* Furthermore, the ex-wife moved out and back to her former home "as soon as the emergency . . . was over." *Id.* Thus, the court seemed to conclude that despite the common residency and the sexual relationship, the ex-wife did not cohabit with the neighbor because the quality of their relationship was temporary and its duration was insufficient to undermine that conclusion. In short, the *Knuteson* court determined that the ex-wife and neighbor did not choose to establish a common residence as a consequence of their relationship—rather the sexual relationship arose from the common residence—and that once they did reside together, the shared abode was never intended to be anything other than temporary—driven by circumstance, not intention. *Id.* Consequently, the two-month-and-ten-day duration was too brief to take the common residency over the threshold into cohabitation. *Id.*

¶24  The present case stands in sharp contrast to *Knuteson*. The district court's unchallenged findings demonstrate that Wife and J.O. established an "intimate and exclusive" dating arrangement that culminated in the couple moving in together. The relationship particularly intensified in the seven months that preceded their move into the Rancho Santa Fe house. During this period, Wife and J.O. became engaged, purchased a house they intended to share, increasingly involved their extended families (as evidenced by J.O.'s spending vacations and holidays with Wife's children and giving them gifts[6]), and just before the move, vacationed together for weeks. The facts thus fully support a

---

6. The district court found that the couple intended the Rancho Santa Fe house to be for Wife and J.O. "to share [their] lives in . . . along with [their] children."

conclusion that neither Wife nor J.O. intended their common residency in Rancho Santa Fe to be temporary. Rather, their move to the California house represented a deliberate escalation of their relationship to something akin to marriage with all the trappings of cohabitation.

¶25   In contrast, during the period before the move, Wife and J.O. traveled together frequently but always with the intent of returning to their respective homes in Salt Lake City. And the intertwining of their personal belongings and financial resources while on vacation seems motivated primarily by convenience related to travel away from home. But in moving to Rancho Santa Fe, they chose a new house to inhabit together and brought significant household and personal property together in one place for what appeared to be the long term. J.O. himself had represented that they were "living together and maintaining a common household" when he completed the application for golf club membership, and a friend testified that she had visited the couple in "their home." Even the relationship between J.O. and Wife's daughters seemed to be affected by the move into the Rancho Santa Fe house. Before the move, J.O. had a presence in the daughters' lives, but after the move, one of Wife's daughters, who was by then an adult, moved in with the couple. Thus, we conclude that, in light of the relationship's progression over more than two years of intimacy marked by frequent periods of vacationing together, the six weeks together in Rancho Santa Fe was not so brief as to nullify as a matter of law the final step they took into cohabitant status once they crossed the threshold of the Rancho Santa Fe house.[7]

---

7. In affirming the district court's conclusion, we do not intend to foreclose the possibility that a six-week period might be sufficiently "brief" in different circumstances to preclude a legal conclusion of cohabitation, just as a two-month period seemed to be under the circumstances in *Knuteson*.

¶26 Accordingly, we affirm the district court's overall conclusion that Wife and J.O. cohabited, but we adjust the date cohabitation began from December 22, 2010, to February 17, 2011, because their vacations together before they moved to Rancho Santa Fe still retained a temporary quality.

B.    The Language of the Cohabitation Provision and the Policies Surrounding Alimony Do Not Undermine This Conclusion.

¶27 Wife contends that the district court's conclusion regarding cohabitation is not supported by the language of the Cohabitation Provision itself or the policies underlying alimony awards in general.[8] The Cohabitation Provision states, "Any order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person." Utah Code Ann. § 30-3-5(10) (LexisNexis Supp. 2014). Wife asserts that use of the present tense "is" "contemplates an ongoing condition" of cohabitation, and that any cohabitation was not ongoing in this case once J.O. moved out in early April 2011.[9] According to Wife, reading the Cohabitation Provision in this way "reflects the economic policy that underlies [alimony] generally," which is "to provide support for the [receiving

---

8. Husband contends that this argument is unpreserved because Wife never made such a statutory interpretation argument in the district court. Because we believe that resolution of the question of whether Wife and J.O. cohabited requires us to interpret the Cohabitation Provision, we address this argument regardless of whether it was properly preserved.

9. It is undisputed that J.O. moved out of the common residence when his relationship with Wife terminated in April 2011 and that Husband did not file the petition to terminate alimony until October 2011, some six months after cohabitation ended.

spouse] as nearly as possible at the standard of living [he or] she enjoyed during marriage, and to prevent the [receiving spouse] from becoming a public charge," *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) (citation and internal quotation marks omitted). Cohabitation, Wife argues, must be presently occurring to further this purpose because cohabitation only functions as a financial substitute for alimony while it is ongoing; she asserts that once "a cohabiting relationship ends, the law places *no* ongoing financial responsibility on either party" and therefore can no longer "legally or functionally replace[] [the] need for financial support."

¶28    The language of the Cohabitation Provision has never been parsed in this way, and our case law has not squarely addressed the issue.[10] Accordingly, we utilize applicable canons

---

10. Utah courts have considered whether there was cohabitation in cases where the conduct claimed to constitute cohabitation had already ended by the time the motion for termination of alimony was filed. *See, e.g.*, *Myers II*, 2011 UT 65, ¶¶ 5–6, 266 P.3d 806 (considering whether the ex-wife and a foster child living in the same home had cohabited during the spring and summer of 2007 when the ex-husband had filed a petition to terminate alimony in January 2008); *Knuteson v. Knuteson*, 619 P.2d 1387, 1388 (Utah 1980) (considering whether the ex-wife and her neighbor had cohabited when the ex-husband filed the petition after the ex-wife had moved back into her home). In these cases, the operative statute also used the word "is" to describe the nature of the relationship that would terminate alimony. *See Knuteson*, 619 P.2d at 1388 (applying a version of the Cohabitation Provision that reads, "[A]limony . . . shall be terminated upon . . . establishing that the former spouse *is* residing with a person of the opposite sex unless . . . the relationship or association between them is without any sexual contact." (emphasis added)); *see also Myers II*, 2011 UT 65, ¶ 5 (applying a version of the Cohabitation Provision with language

(continued…)

of construction to ascertain the meaning of the statute. When interpreting a statute, an appellate courts' "primary goal is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *State v. Burns*, 2000 UT 56, ¶ 25, 4 P.3d 795. Because "[t]he best evidence of the legislature's intent is the plain language of the statute itself," we will assume, "absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citations and internal quotation marks omitted). We will follow this practice "unless such a reading is unreasonably confused, inoperable, or in blatant contravention of the express purpose of the statute," *Black v. Black*, 2008 UT App 465, ¶ 7, 199 P.3d 371 (citation and internal quotation marks omitted), or requires "a result [that is] so absurd that the legislative body which authored the legislation could not have intended it," *Marion Energy*, 2011 UT 50, ¶ 26 (citation and internal quotation marks omitted). Additionally, we must construe the plain language "as a whole" and "in harmony with" the other provisions of the statute as well as "other statutes in the same chapter and related chapters." *In re A.T.*, 2015 UT 41, ¶ 16, 353 P.3d 131 (citation and internal quotation marks omitted).

¶29    To begin with, the Cohabitation Provision immediately follows a provision governing the remarriage of a spouse who has been receiving alimony (the Remarriage Provision). It appears that the legislature had the same purpose in enacting each provision: to terminate alimony when a new relationship "legally or functionally replaces the need for financial support."

_____

(…continued)
identical to the current version). However, the question of whether cohabitation must be contemporaneous with the alimony termination proceeding was not before the courts in those cases.

*See generally Myers I*, 2010 UT App 74, ¶ 12, 231 P.3d 815 (observing that the "the principal purpose of alimony is economic," ensuring the recipient spouse is provided for without penalizing the payor spouse), *aff'd*, 2011 UT 65, 266 P.3d 806. Thus, the two provisions are structured to provide that alimony "terminates" upon the occurrence of a particular event. The Remarriage Provision provides that "alimony to a former spouse automatically terminates upon the remarriage . . . of th[e] former spouse." Utah Code Ann. § 30-3-5(9). The Cohabitation Provision provides that "alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person." *Id.* § 30-3-5(10). The only significant difference in the two provisions is the means by which termination occurs.

¶30    With remarriage, alimony "*automatically* terminates" at the time of the marriage whereas with cohabitation, alimony "terminates *upon establishment*" of cohabitation. *Id.* § 30-3-5(9), (10) (emphases added). Having alimony "automatically terminate[]" upon remarriage makes sense, because it is generally a straightforward process to establish both that a marriage occurred and when it began. The persons intending to marry must obtain a marriage license, solemnize the marriage within thirty days, and send proof of the solemnization and the date of its occurrence (by returning the license and certificate of marriage) to the county clerk for recordation in the public records. *Id.* §§ 30-1-6, -7, -8, -11, -12 (LexisNexis 2013).[11]

¶31    Cohabitation, however, is not as readily established. As demonstrated by our analysis above, ascertaining both the fact of cohabitation and the date of its commencement can require a

---

11. The Utah Legislature amended section 30-1-6 during the 2015 General Legislative Session, but that amendment does not affect this appeal. *See* Utah Code Ann. § 30-1-6 (LexisNexis Supp. 2015).

complex factual and legal analysis on a case-by-case basis. The legislature seems to have structured the Cohabitation Provision with that in mind, recognizing that there is often not a bright line and that a process may be required to determine whether cohabitation has actually occurred. The Cohabitation Provision requires alimony to continue until the cohabitation is proven or established. The alimony consequences may then take effect as of the date cohabitation began, just as in the case of a remarriage.

¶32    Nevertheless, the strongest statutory support for Wife's interpretation of the Cohabitation Provision is the use of the present-tense "is." *See id.* § 30-3-5(10) (LexisNexis Supp. 2014) ("[A]limony to a former spouse terminates upon establishment by the party paying alimony that the former spouse *is* cohabitating with another person." (emphasis added)). Instead of "is," the legislature certainly could have used the present perfect tense—"has cohabited"—which would have "denote[d] an act, state, or condition that is now completed or continues up to the present." *See Richards v. Brown*, 2012 UT 14, ¶ 27, 274 P.3d 911 (emphasis, citation, and internal quotation marks omitted); *see also Marion Energy*, 2011 UT 50, ¶ 14 (providing that the general rules of statutory construction require an interpretation in accordance with the ordinary and plain meaning of the language used). But when the present-tense verb is read within the context of the Cohabitation Provision as a whole, *see In re A.T.*, 2015 UT 41, ¶ 16, the argument that its use demands that cohabitation be ongoing at the time of determination seems less persuasive. In discontinuing alimony upon establishment of cohabitation, the legislature chose to use the word "terminate" to convey that cohabitation cuts off alimony entirely. *See Marion Energy*, 2011 UT 50, ¶ 14 (explaining that the general rule that we utilize the ordinary and accepted meaning of a particular word is only overridden when there is evidence of contrary intent); *Black's Law Dictionary* 1609 (9th ed. 2009) (defining "terminate" as "[t]o end; to conclude"). This unequivocal language precludes an interpretation that alimony might then be reinstated should the cohabitation that ended the alimony itself come to an end. If,

as Wife contends, the legislature intended to require proof of contemporaneous cohabitation at the time alimony terminates to protect the receiving spouse from economic insecurity, only an express provision for alimony reinstatement once cohabitation ends—or, alternatively, a provision that alimony is only suspended during cohabitation—would seem to fit the bill.[12] In the absence of such a provision, we think the word "is" cannot bear the burden of an interpretation that requires such a complex approach, and there is no other language in the statute to justify encumbering it with such a burden.

¶33    Furthermore, a "present cohabitation" construction of the Cohabitation Provision could lead to results that the legislature "could not have intended." *See Marion Energy*, 2011 UT 50, ¶ 26 (citation and internal quotation marks omitted). Requiring cohabitation to be presently occurring, at best, makes cohabitation a more advantaged method of engaging in long-term relationships than remarriage and, at worst, encourages abuse by creating an incentive for a cohabiting spouse to simply cease cohabitation in order to avoid its consequences, even when the relationship itself has not ended.[13] For example, under the

---

12. The fact that the Remarriage Provision provides for reinstatement of alimony if the marriage is annulled further demonstrates that the legislature could have provided for alimony reinstatement after termination. *Cf. State v. Larsen*, 865 P.2d 1355, 1358 (Utah 1993) (explaining that the legislature must not have required a mens rea of "scienter" when it used "willfully" to describe the criminal conduct because "a brief survey of the [Utah] Code confirms that the Utah legislature knows how to require scienter, if it so desires, by including specific language to that effect").

13. This concern is not unfounded. For example, South Carolina specifically defines cohabitation as "mean[ing] the supported spouse resides with another person in a romantic relationship

(continued…)

Remarriage Provision, once a person who is receiving alimony remarries, his or her alimony payments from the former spouse terminate forever. Utah Code Ann. § 30-3-5(9). But interpreting the Cohabitation Provision to terminate alimony only during periods of active cohabitation could create an incentive for persons receiving alimony to simply cohabit rather than marry, so that if the new relationship does not endure, the alimony from the former spouse would resume. This could result in something of a statutory preference for cohabitation over marriage, which seems unlikely to have been the legislature's intent.[14]

---

(…continued)

for a period of ninety or more consecutive days" and provides that "[t]he court may determine that a continued cohabitation exists if there is evidence that the supported spouse resides with another person in a romantic relationship for periods of less than ninety days and the two periodically separate in order to circumvent the ninety-day requirement." S.C. Code Ann. § 20-3-150 (2002). South Carolina's statutory scheme specifically anticipates that some couples will attempt to circumvent the ninety-continuous-day requirement by making it appear as though the cohabitation relationship had terminated when, in fact, it did not. As a result, courts in South Carolina have had to determine whether or not a couple has circumvented the ninety-continuous-day requirement to avoid the alimony consequences. *See, e.g.*, *Biggins v. Burdette*, 708 S.E.2d 237, 238—39 (S.C. Ct. App. 2011).

14. We note, however, that for those choosing between cohabitation and remarriage, there would also be counterbalancing and, for some, weightier incentives to remarry rather than cohabit, regardless of the alimony consequences. These incentives include, among other things, legitimization of children, inheritance rights, and property rights. Nevertheless, a statutory scheme that reinstates alimony upon dissolution of a

(continued…)

¶34   In addition, Wife has offered no guidance on how to feasibly implement an interpretation requiring present cohabitation. For example, must the recipient spouse presently be cohabiting at the time of the motion to terminate alimony or at some later point, such as a hearing on the motion or at trial? Because cohabitation relationships can cease at any time (as illustrated by the facts of this case), there is the potential that the couple will simply cease cohabitation in advance of that date to avoid the consequence if the Cohabitation Provision were to require that the recipient spouse "is cohabitating" at the time of a hearing or trial. And even if the language were interpreted to require present cohabitation only at the time of the filing of a motion to terminate, a determined couple may endeavor to forever avoid "present" cohabitation for purposes of the Cohabitation Provision, all the while engaging in what amounts to a serial cohabitation relationship, periodically interrupted for strategic reasons. We recognize that not all persons with alimony on the line would behave in such a way and that there may be other potential consequences that would make such an approach impracticable, but it is this potential for abuse that underscores our conclusion that Wife's reading of the Cohabitation Provision could create unintended and undesirable results. The alternative reading—that once the recipient spouse's cohabitation is demonstrated or "established" through an appropriate process, alimony terminates as of the date the cohabitation began— provides a much more predictable outcome and better accords with the purpose of alimony to provide for the recipient spouse's needs without penalizing the payor spouse. *See Myers I*, 2010 UT App 74, ¶ 12, 231 P.3d 815, *aff'd*, 2011 UT 65, 266 P.3d 806.

---

(…continued)

cohabitation relationship potentially allows an alimony payee to accrue the benefit of a new relationship markedly similar to remarriage without incurring its concomitant legal burden (namely, the permanent termination of alimony that remarriage would otherwise impose).

¶35 We acknowledge Wife's argument that requiring termination of alimony in these circumstances does not entirely align with the general economic policies underlying alimony. Wife has accurately identified that "the principal purpose of alimony is economic." *Id.* The "most important function of alimony is to provide support for the [receiving spouse] as nearly as possible at the standard of living [he or] she enjoyed during marriage, and to prevent the [receiving spouse] from becoming a public charge." *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) (citation and internal quotation marks omitted); *see also English v. English*, 565 P.2d 409, 411 (Utah 1977) (explaining that the alimony "is not intended as a penalty against" the payor spouse). And in this regard, cohabitation is qualitatively different from remarriage. Remarriage provides a legally binding substitute for alimony; cohabitation does not. When a recipient spouse remarries, that spouse is making a legal decision to separate his or her financial interests from the former spouse and to realign them with a new one. *See Gayet v. Gayet*, 456 A.2d 102, 103 (N.J. 1983) ("[There is] a policy to end alimony when the supported spouse forms a new bond that eliminates the prior dependency as a matter of law."). The second spouse then acquires a legal obligation for financial support both during the marriage and, if the couple divorces, after its dissolution if the circumstances properly align. *Myers I*, 2010 UT App 74, ¶ 16. With the exception of a marriage that is "annulled and found to be void ab initio," this is true even if the second marriage is ultimately short term. Utah Code Ann. § 30-3-5(9). Conversely, even if cohabitation creates a practical realignment of financial interests between cohabiting parties, it is rare that such a change would have legal significance once the relationship ends; rather, as Wife asserts, the cohabiting relationship "'can be readily broken off without obligation.'" (Quoting Diane M. Allen, Annotation, *Divorced or Separated Spouse's Living with Member of Opposite Sex as Affecting Other Spouse's Obligation of Alimony or Support Under Separation Agreement*, 47 A.L.R. 4th 38 § 2(b) (1986), for the idea that the lack of legal obligation in a cohabiting

relationship would leave the person receiving alimony financially vulnerable if the relationship were to end.)

¶36 Nevertheless, we conclude that the language of the Cohabitation Provision and the cases that have interpreted it require the decision we have come to today. In reaching this conclusion, we are not insensitive to the cost of this result for Wife; she has lost her long-term alimony award due to her cohabitation with J.O., and because that relationship has also ended, Wife is left with none of the legal benefits that a marriage might have provided. But we emphasize that a former spouse receiving alimony who enters into a cohabitation relationship makes a choice under our law. As part of that choice, the former spouse hazards the security of an ongoing alimony award for whatever benefits, economic or non-economic, he or she anticipates from the new relationship.[15] If that cohabiting relationship dissolves, the recipient spouse has still forfeited his or her entitlement to alimony just as if he or she had entered into

---

15. Indeed, although this decision cuts off Wife's alimony only four-and-a-half years into a twenty-seven-year term, she and Husband stipulated to the alimony provisions of the divorce. Included within the divorce decree is a provision that "[a]limony shall terminate upon the remarriage *or cohabitation* of [Wife]." (Emphasis added.) And it is apparent that Wife was aware of the risk. In describing her alimony negotiations with Husband, Wife said she stipulated to "lowered . . . alimony so that when [she] did fall in love with a man it would be easy to give up that extra . . . money." (Emphasis omitted.) And the record shows that, with the potential consequences of her alimony award in mind, she was deliberately careful to avoid taking steps that she thought would cut off her alimony until she felt secure about her relationship with J.O.

a short-term marriage.[16] Moreover, although a failed cohabitation relationship may be accompanied by a significant economic cost to a former spouse who would otherwise have continued to receive alimony, our conclusion is bolstered by the consideration that the task of balancing competing policy goals and crafting a statute that appropriately expresses that balance is the province of the legislature, not the courts. *See Lindsay v. Walker*, 2015 UT App 184, ¶ 24, 356 P.3d 195 ("Our constitutional responsibility is not to redefine the line based upon competing considerations (even when those considerations may be compelling) but to interpret the statute as written.").[17]

---

16. Although this is generally the case, we note that here Wife and J.O. ultimately reached a "financial settlement . . . [relating to] their relationship," in which J.O. paid Wife $110,000 "to give him a release of [any] claims" she may have had against him arising from their relationship.

17. Other jurisdictions have taken different approaches to cohabitation's effect on alimony. For example, in some states, the alimony award may be modified, rather than ended, upon a showing that the cohabitation creates a material change in financial circumstances. In these states, the monetary needs of the receiving party drive the analysis, and if the cohabiting relationship has not changed or altered the financial needs of that party, the alimony award will not be disturbed. *See, e.g.*, Conn. Gen. Stat. Ann. § 46b-86(b) (West 2013) ("[T]he Superior Court may . . . modify such judgment and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should result in the modification, suspension, reduction, or termination of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party."); *Horr v. Horr*, 445 N.W.2d 26, 28 (S.D. 1989) ("Although remarriage

(continued…)

¶37    In sum, we affirm the district court's overall decision that Wife cohabited with J.O. The court's findings, however, only support a determination that cohabitation began on February 17, 2011. Thus, we modify the court's decision in that respect.

## II. Judgment to Husband

¶38    Because we have affirmed the district court's conclusion that Wife and J.O. cohabited, we also affirm its decision to retroactively terminate Wife's alimony as of the date of

---

(…continued)

makes a prima facie case for termination of alimony, cohabitation, in and of itself, is not a circumstance upon which alimony may be modified or terminated. Cohabitation may be considered as a sufficient change in circumstances for alimony modification only when it affects the financial needs of the recipient." (citations omitted)). Maine provides that alimony may not be terminated until the cohabitation exceeds a specified period of time. *See* Me. Rev. Stat. Ann. tit. 19-A, § 951-A(12) (2013) ("When it appears that justice requires, an order awarding spousal support is subject to modification to terminate spousal support when it can be shown that the payee and another person have entered into a mutually supportive relationship that is the functional equivalent of marriage that has existed for at least 12 months of a period of 18 consecutive months."). And Massachusetts allows for reinstatement of alimony payments upon cessation of the cohabitation relationship. *See* Mass. Gen. Laws Ann. ch. 208, § 49(d)(2) (West 2012) (providing that "[g]eneral term alimony shall be suspended, reduced, or terminated upon the cohabitation of the recipient spouse" but that "[a]n alimony obligation suspended, reduced or terminated under this subsection may be reinstated upon termination of the recipient's common household relationship; but, if reinstated, it shall not extend beyond the termination date of the original order.").

cohabitation and award Husband a judgment for the amount of alimony paid from the time she began cohabiting. District courts have discretion to retroactively terminate alimony to the date cohabitation began. *See Black v. Black*, 2008 UT App 465, ¶ 13, 199 P.3d 371. However, because we have determined that cohabitation began February 17, 2011, and not December 22, 2010, the calculation of the judgment for Husband is inaccurate. Thus, we remand for the district court to adjust the amount of the judgment accordingly.

## CONCLUSION

¶39 We affirm the district court's decision to terminate alimony on the ground that Wife cohabited. Cohabitation began, however, on February 17, 2011, not on December 22, 2010. Thus, we remand for the district court to reduce the judgment it awarded Husband for alimony previously paid.

———