2024 UT App 120

## THE UTAH COURT OF APPEALS

JULIE KINSEY,
Appellee,
*v.*
GLEN D. KINSEY,
Appellant.

Opinion
No. 20230088-CA
Filed August 22, 2024

Third District Court, Salt Lake Department
The Honorable Dianna M. Gibson
No. 204907035

K. Bradley Carr, Attorney for Appellant

Cory R. Wall, Attorney for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1     Glen Kinsey and Julie Kinsey divorced in 2021.[1] The next year, Glen filed a petition asking the district court to terminate his alimony obligations, claiming that Julie had cohabited with another man. After an evidentiary hearing, the district court issued a ruling rejecting Glen's petition. Glen now appeals that decision. For the reasons set forth below, we affirm.

---

1. Because the parties share the same last name, we'll follow our usual practice and refer to them by their first names, with no disrespect intended by the apparent informality.

## BACKGROUND

### *Petition to Modify*

¶2    Julie and Glen were married in 1994 and divorced in January 2021. In the divorce decree, Glen was ordered to pay Julie alimony for twenty-six years, which was the length of the marriage.

¶3    In January 2022, Glen filed a petition to modify the decree. In his petition, Glen alleged that he had retained two private investigators and that they had obtained evidence showing that between March 2021 and August 2021, Julie and another man (Boyfriend) had "cohabited in a relationship akin to marriage."[2] Relying on this evidence, Glen asked the district court to terminate his alimony obligations.

¶4    Julie opposed the petition. In her memorandum, Julie acknowledged that she was "in a relationship" with Boyfriend, that they were currently "dating," and that she had "stayed overnight" at his home "as a guest." But even so, Julie claimed that she had never "liv[ed] at his residence," instead claiming that she and her adult daughter had resided at her parents' home after she sold the marital home following the divorce. For these and other reasons, Julie argued that she and Boyfriend had not cohabited and that Glen's alimony obligations should not be terminated.

¶5    The district court held a two-day evidentiary hearing on the issue in September and October 2022. At that hearing, the parties called several witnesses and introduced evidence about

---

2. The parties both referred to the man in question by name in their briefs, and the district court did so as well in its decision. But in the interest of privacy, we see no need to include his name in this published opinion. For simplicity, and seeing no better option, we'll refer to him as Boyfriend, while recognizing that this may not have been the label that Julie used when describing him.

the nature of the relationship between Julie and Boyfriend, as well as about other factors potentially relevant to a cohabitation determination.[3]

*Ruling*

¶6     The court subsequently issued a written ruling denying Glen's petition. At the outset of its findings of fact, the court found that "[s]ometime after the divorce, Julie began dating [Boyfriend]." It also found that Julie and Boyfriend had each admitted that their relationship was "romantic and intimate." In the remainder of its findings of fact, the court summarized the testimony (and it sometimes, though not always, resolved conflicts in the testimony) about various aspects of the relationship between Julie and Boyfriend. These findings included the following:

- **Overnights in the summer of 2021.** The court noted that Glen's private investigator had testified that Julie spent 31 out of 47 nights at Boyfriend's home between the end of June and the middle of August of 2021, and it also noted that there had been testimony that Julie and Boyfriend had spent several nights together on vacation during that same timeframe.

- **Overnights later in 2021 and in 2022.** The court then recounted (but did not necessarily resolve) the sometimes-conflicting testimony about how often Julie and Boyfriend spent nights together at Boyfriend's home after the summer of 2021. On Glen's side of this dispute, the court

---

3. At the hearing, the parties introduced evidence of some events that occurred in 2022 after Glen filed the petition to modify. And as will be seen shortly, the district court entered findings relating to post-petition conduct in its ruling. On appeal, Glen argues that the post-petition conduct was "tried by consent," and Julie does not dispute that contention in her appellate brief. As a result, we'll consider the post-petition conduct throughout this opinion.

noted that Glen had testified that he had driven by and seen "Julie's car parked in front of [Boyfriend's] home" in the late evening or very early morning hours on 26 different days between late February and mid-August 2022. On Julie's side, the court noted that Julie had testified that she spent "more nights" at her parents' home than she did at Boyfriend's, as well as that Julie's father had testified that he "typically has breakfast and dinner with [Julie]" and that she did not "spend[] more time at [Boyfriend's] home than his." The court also noted Boyfriend's testimony that Julie "stays at his home likely 3-4 times a week," as well as Boyfriend's insistence that they "do not live together." From all this, the court found that after the period from June to August 2021, "the evidence, at best, shows that" Julie stayed at Boyfriend's "home regularly each week, but it does not show" that they "consistently" spent nights together at a rate as high as they had during the summer of 2021.

- **Access and use of residences.** The court found that Julie did not have a key to Boyfriend's home and that Boyfriend did not have a key to the home of Julie's parents. The court also found that Julie "does not stay at [Boyfriend's] place when he is not there."

- **Property.** In the written briefing, the parties had disputed whether and to what extent Julie stored her personal property at Boyfriend's home. In its findings, the court only addressed the extent to which Julie had stored her "wave runners" there. It noted that Glen had testified that the wave runners had been stored at Boyfriend's home throughout the summer of 2021, but the court also noted (and seems to have credited) testimony that Boyfriend was fixing the wave runners that summer and that they were more typically stored at the home of Julie's sister.

- **Finances.** The court found that Julie and Boyfriend "do not share finances and do not pay each other's expenses." The court also found that Julie and Boyfriend "do not share bank accounts or credit cards" and "do not own property together." The court further found that Boyfriend leases his home and that "Julie is not on the lease."

- **Julie's bills and other documents.** The court found that Julie used her parents' address as her address for such things as her "bills, statements and mail related to her phone, car and health insurance, retirement, bank, pet hospital, Costco [membership], GMC recall notice, medical information, and driver's license."

¶7 In its conclusions of law, the district court then ruled that Glen had failed to prove by a preponderance of the evidence that Julie "was or is cohabiting with [Boyfriend]." In doing so, the court recognized that a new statutory definition for the term "cohabit" became effective on May 5, 2022. But the court decided to assess the question under "the traditional cohabitation analysis" from the common law. It did so for two reasons. First, the court saw no indication that the new "statutory definition was intended to call into question or vacate Utah's common law cohabitation analysis . . . or eliminate[] from consideration the factors historically deemed to be indicative of 'cohabitation.'" And second, the court noted that Glen had filed his petition in January 2022 (before the new statutory definition went into effect), and the court saw no basis for applying the new statutory definition retroactively to conduct that predated the statute's enactment.

¶8 Applying pre-2022 caselaw, the court observed that because the "clear" "purpose of alimony is economic in nature," alimony should only be terminated for post-divorce cohabitation if there is evidence of not just "a sexual relationship between two individuals living under the same roof" but also "a relationship 'akin' to marriage." Drawing on the findings set forth above, the court concluded that there was "no evidence to show that Julie

and Boyfriend 'shared' his residence," nor was there "evidence to show that [Julie's] financial dependency has been eliminated by another more permanent romantic relationship." In the court's view, there was "no evidence that they shared finances, household expenses, accounts, property, or made any decisions together." From all this, the court concluded that Glen had failed to establish that Julie and Boyfriend were "in a relationship akin to that of a husband and wife." It accordingly concluded that Julie had not cohabited with Boyfriend, and it thus denied Glen's request to terminate his alimony obligations.

ISSUE AND STANDARD OF REVIEW

¶9     Glen challenges the district court's conclusion that Julie had not cohabited with Boyfriend. A "cohabitation determination is a fact-intensive determination of a mixed question of fact and law that is entitled to substantial deference on appeal." *Scott v. Scott*, 2020 UT 54, ¶ 34, 472 P.3d 897. But to the extent that this determination turns on the interpretation of a statute, the "proper interpretation and application of a statute is a question of law which we review for correctness." *McFarland v. McFarland*, 2021 UT App 58, ¶ 19, 493 P.3d 1146 (quotation simplified).

ANALYSIS

¶10    By statute, a court

> shall terminate an order that a party pay alimony to a former spouse if the party establishes that, after the order for alimony is issued, the former spouse cohabits with another individual even if the former spouse is not cohabiting with the individual when the party paying alimony files the motion to terminate alimony.

Utah Code § 30-3-5(14)(a). When a person seeks to terminate his or her alimony obligations under this statute, the person must establish cohabitation by a preponderance of the evidence. *See Myers v. Myers*, 2011 UT 65, ¶ 29, 266 P.3d 806.

¶11 On appeal, Glen challenges the district court's conclusion that he failed to establish that Julie cohabited with Boyfriend. Before addressing Glen's argument, we first note that the parties disagree about which definition of "cohabit" we should use in our analysis.

¶12 The term "cohabit" (or its noun-form "cohabitation") comes into play in several aspects of domestic law. As noted, cohabitation is grounds for terminating an alimony award. Elsewhere, cohabitation is one of the elements for an unsolemnized marriage determination. *See* Utah Code § 30-1-4.5(1)(c). And it is also one of the elements of the crime of bigamy, *see id.* § 76-7-101(4)(a); can be grounds for denying an adoption, *see id.* § 78B-6-117(3) (prohibiting the adoption of a child "by an individual who is cohabiting," barring certain exceptions); and constitutes one of the relationship types for which a protective order may be granted, *see id.* §§ 78B-7-601 to -609 (authorizing "Cohabitant Abuse Protective Orders").

¶13 Up until 2022, the term was not defined by statute in the divorce context. Instead, its meaning had been developed through the common law. Early use of the term in the broader domestic context explained that "the word 'cohabit' as used in the statutes has had the ordinary common meaning—to live together as husband and wife." *State v. Barlow*, 153 P.2d 647, 651 (Utah 1944); *see also Haddow v. Haddow*, 707 P.2d 669, 671 (Utah 1985) (citing dictionaries for the proposition that "cohabitation" means "to live together as husband and wife" (quotation simplified)). In 1995, the statute allowing a former spouse to terminate alimony was amended to include the term "cohabitating" for the first time. *See*

Utah Code § 30-3-5(9) (1995).[4] Because the statutory amendment did not define the term, courts applied the meaning of "cohabitation" that had been established by this existing line of domestic law cases. *See, e.g.*, *Hill v. Hill*, 968 P.2d 866, 868–69 (Utah Ct. App. 1998) (supporting the practice of applying the "*Haddow* definition of cohabitation" in cases determining the termination of alimony); *Pendleton v. Pendleton*, 918 P.2d 159, 160 (Utah Ct. App. 1996) (relying on the *Haddow* formulation to determine if alimony should be terminated); *Sigg v. Sigg*, 905 P.2d 908, 917 (Utah Ct. App. 1995) (same).

¶14    In 2020, our supreme court drew on this same line of cases and held that the "key question" in a cohabitation case was whether the couple had "entered into a relationship akin to that generally existing between husband and wife." *Scott v. Scott*, 2020 UT 54, ¶ 35, 472 P.3d 897 (quotation simplified). But the supreme court also recognized that it could be "difficult to define" the precise contours of this relationship. *Id.* (quotation simplified). To assist lower courts, the supreme court drew upon past cases and "identifie[d]" the "general hallmarks" of such a relationship. *Id.* (quotation simplified); *see also Myers*, 2011 UT 65, ¶ 24. These hallmarks included "a shared residence, an intimate relationship, . . . a common household involving shared expenses and shared decisions, . . . the length and continuity of the relationship, the amount of time the couple spends together, the nature of the activities the couple engages in, and whether the couple spends

---

4. Specifically, the statute stated, "Any order of the court that a party pay alimony to a former spouse terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person." Utah Code § 30-3-5(9) (1995). Previously, the statute allowed termination of alimony "upon establishment by the party paying alimony that the former spouse [was] residing with a person of the opposite sex" unless the person receiving alimony could show "that that relationship or association [was] without any sexual contact." *Id*. § 30-3-5(6) (1994).

vacations and holidays together." *Scott*, 2020 UT 54, ¶ 36 (quotation simplified).

¶15 In 2022, the Utah Legislature added a new provision to Utah Code section 30-3-5 (which governs various aspects of an alimony determination) that, for the first time, defined the term "cohabit" for alimony decisions. *See* Act of Mar. 23, 2022, ch. 263, § 1, 2022 Utah Laws 1883, 1883. This definition became effective on May 4, 2022. *See id.* Under this definition, "cohabit" means "to live together, or to reside together on a regular basis, in the same residence and in a relationship of a romantic or sexual nature." Utah Code § 30-3-5(1)(a).

¶16 As noted, Glen filed his petition to modify in January 2022, and much of the evidence that the district court considered predated May 4, 2022. But as also noted, the court considered evidence of conduct that occurred after May 4, 2022, as well.

¶17 This leads to the initial question posed by the parties in this appeal: whether this case should be assessed under the common law test or instead under the test set forth in the 2022 statute. In Glen's view, (1) the new statutory definition "clearly and unequivocally express[ed] the legislature's intended meaning of the term" to the exclusion of the prior case law, and (2) the new definition should apply retroactively because his petition to modify was still pending at the time the amendment went into effect. By contrast, Julie argues that (1) the new definition is consistent with prior caselaw (i.e., that it did not abrogate the common law definition), and (2) if the statutory definition somehow did abrogate prior caselaw, it should not be retroactively applied.

¶18 We need not decide whether the common law test or instead the new statutory definition governs this case. This is so because no matter which approach is used, we see no error in the court's cohabitation determination.

A.     Common Law Test

¶19     Again, under the common law, the "key question" is whether Julie and Boyfriend had "entered into a relationship akin to that generally existing between husband and wife." *Scott*, 2020 UT 54, ¶ 35 (quotation simplified). And under this approach, we look to see if the "hallmarks of marriage" were present. *Id.* (quotation simplified). These hallmarks include

> a shared residence, an intimate relationship, . . . a common household involving shared expenses and shared decisions, . . . the length and continuity of the relationship, the amount of time the couple spends together, the nature of the activities the couple engages in, and whether the couple spends vacations and holidays together.

*Id.* ¶ 36 (quotation simplified).

¶20     On this record, there's no question that Julie and Boyfriend were in a relationship by the summer of 2021—indeed, Julie and Boyfriend each admitted that they had been "romantic and intimate." It's undisputed that the two vacationed together in 2021. And it's also undisputed that they spent many nights together.

¶21     But even so, their relationship was still missing many of the other "hallmarks of marriage." To recap some of the key findings outlined above: Julie didn't have a key to Boyfriend's home; the two did not make financial decisions together and did not have shared bank accounts or credit cards; there was no evidence that they made any other "decisions together" either; Julie was not on the lease to Boyfriend's home, nor did they own any other property together; Julie typically had breakfast and dinner with her father at his home (rather than having those meals with Boyfriend at his home); and Julie's mail (including important correspondence such as her bills and medical statements) was

sent to the home she shared with her parents, not to Boyfriend's home.

¶22    Based on all this, the district court concluded that Julie and Boyfriend were not cohabiting under the common law test. And as indicated, this "determination is a fact-intensive determination of a mixed question of fact and law that is entitled to substantial deference on appeal." *Id.* ¶ 34. In light of both the district court's findings and the deference we give to its determination, we see no basis for overturning this decision.[5]

B.    Statutory Definition

¶23    Under the statutory definition that became effective in May 2022, "cohabit" means "to live together, or to reside together on a regular basis, in the same residence and in a relationship of a romantic or sexual nature." Utah Code § 30-3-5(1)(a).

¶24    We first note that this test refers to both *living together* and *residing together*. We recognize that it may be possible that the legislature thought these two concepts refer to different things. After all, they're separated by the word "or," which is usually

---

5. As indicated, the common law test also turned in some measure on whether the couple was residing or living together. *See Scott v. Scott*, 2020 UT 54, ¶ 36, 472 P.3d 897; *Haddow v. Haddow*, 707 P.2d 669, 671 (Utah 1985). In *Scott*, however, our supreme court cautioned that residency did not function as a standalone or "threshold element that must be met before other hallmarks of marriage" could be considered, instead holding that all of the hallmarks of marriage (including a common residence) were considered together "in a holistic inquiry." 2020 UT 54, ¶ 40.

    In the statutory analysis below, we conclude that Julie and Boyfriend did not reside together, and we ground that conclusion in the common law's definition of the term "residence." If this case is analyzed under the common law test, our conclusion that there was no common residence provides additional support for our conclusion that Julie and Boyfriend did not cohabit.

understood to be disjunctive, and the surplusage canon would likewise suggest that these separate terms should be given separate meanings. *See Croft v. Morgan County*, 2021 UT 46, ¶ 32, 496 P.3d 83. But on the other hand, the terms have obvious similarity, so in context, we think it's also possible that the legislature intended for them to function synonymously in a mutually reinforcing, "belt and suspenders" kind of way. If there is such a difference, however, the parties haven't meaningfully briefed what it would be. Instead, in their briefs, the parties focused on whether Julie and Boyfriend "resided" together. Taking the parties' lead, we likewise focus on whether Julie and Boyfriend resided together. Because we conclude that they did not, and in light of how this case has been presented to us on appeal, we have no need to opine on whether it is possible to live together without residing together.

¶25 When the legislature added a definition for the term "cohabit," it did not also add a definition for the term "reside." As a result, we must make our best effort to interpret this term, and we do so "according to the plain meaning of its text," applying "the meaning" of the word in its "ordinary daily usage." *In re J.E.*, 2023 UT App 3, ¶ 40, 524 P.3d 1009 (quotation simplified). The potential difficulty here is that the "terms 'residence' and 'reside' are open to a diverse array of usages and interpretations" and the term "resident" likewise "has different shades of meaning, depending upon its context." *Lilly v. Lilly*, 2011 UT App 53, ¶ 12, 250 P.3d 994 (quotation simplified). But in cases that predate the 2022 statute, our supreme court repeatedly provided guidance for what "reside" and "residency" mean in the cohabitation and alimony context. And this matters—after all, "when a word or phrase is transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (quotation simplified). Seeing no indication to the contrary, we think it appropriate to assume that when the legislature defined the term "cohabit" to mean, in part, that the people in question were "resid[ing] together," the legislature did so advisedly and

incorporated the prior definitions of "reside" that have been used by Utah's appellate courts in this same context.

¶26    As set forth in those cases, the word "reside" means "to dwell permanently or for a length of time" or "to have a settled abode for a time." *Knuteson v. Knuteson*, 619 P.2d 1387, 1389 (Utah 1980) (quotation simplified); *see also Keene v. Bonser*, 2005 UT App 37, ¶ 11, 107 P.3d 693. This refers to something that is "more than a temporary stay." *Haddow*, 707 P.2d at 672. It's "not a sojourn, nor a habit of visiting, nor even remaining with for a time." *Id.* at 673 (quotation simplified). Instead, "the term implies continuity." *Id.* (quotation simplified). In this sense, our supreme court has "contrast[ed] the status of a 'resident' with that of a 'visitor.'" *Scott*, 2020 UT 54, ¶ 45 (quotation simplified).

¶27    Past cases illustrate how this distinction plays out. In *Haddow*, our supreme court considered the question of whether a former spouse had developed a "common residency" with her new partner after her divorce. 707 P.2d at 673. Although it was "clear from the record" that the new partner "spent a substantial amount of time" at the ex-wife's home, the supreme court held that the two were not residing together. *Id.* The supreme court noted that there was "no finding" from the district court that the new partner "either spent any time at the home when [the ex-wife] was not there or had a key to the house." *Id.* The supreme court thought "[t]hese circumstances seem[ed] particularly significant," "since a resident will come and go as he pleases in his own home, while a visitor, however regular and frequent, will schedule his visits to coincide with the presence of the person he is visiting." *Id.* The supreme court also pointed out that the new partner had not "move[d] any furniture into" the ex-wife's home or kept "any personal items" there "other than toiletry articles, a few items of clothing[,] . . . and one picture album." *Id.* This, too, suggested to the supreme court that the ex-wife and her new partner did not share a common residency—and, thus, were not cohabiting. *See id.*

¶28    By contrast, in *Pendleton v. Pendleton*, this court affirmed a district court's decision that an ex-wife had resided with her new boyfriend. 918 P.2d 159, 160 (Utah Ct. App. 1996). We noted that the boyfriend stayed with the ex-wife "ninety percent of the time when he was in town," "had his own key," and "came and went from [the ex-wife's] home three to four times daily, even when she was not there." *Id.* at 161. We further noted that the couple tended to eat "almost all meals together" and that the boyfriend kept "clothing and other personal effects" at the ex-wife's home—details that we believed supported a cohabitation determination. *Id.*

¶29    Our supreme court reached a similar conclusion in *Scott*. There, the ex-wife's new partner had made an offer on a new home "on behalf of both himself and [the ex-wife]." *Scott*, 2020 UT 54, ¶ 49. After the new partner purchased this home, the ex-wife "moved herself and substantial personal items into" it, and in doing so, she "made decisions about decorations and furnishings." *Id.* ¶ 50. Moreover, the ex-wife and her new partner both "had keys and full access to the home." *Id.* In light of these facts, the supreme court affirmed the district court's determination that this new home was a "shared residence." *Id.* ¶ 51.

¶30    Applying these principles here, we affirm the district court's determination that Julie and Boyfriend did not reside together. As noted, the district court found that Julie does not have a key to Boyfriend's home and that Julie "does not stay at [Boyfriend's] place when he is not there." These are the very same facts that the supreme court thought were "particularly significant" when it held that there was no common residency (and, by extension, no cohabitation) in *Haddow*. 707 P.2d at 673. Moreover, there was no finding from the district court that Julie had moved any substantial portion of her personal belongings into Boyfriend's home. Aside from the wave runners (which, under the court's findings, were arguably at Boyfriend's home just so that Boyfriend could fix them), there was no finding from the district court that Julie kept anything at Boyfriend's home at

all. In addition, Julie was not on the lease, did not receive her mail there, and commonly ate breakfast and dinner with her father at his home.

¶31 Despite all this, Glen argues that Julie did reside at Boyfriend's home. Glen's argument relies heavily on the amount of nights that Julie spent with Boyfriend. We certainly agree that the amount of time that a person spends at another person's home (particularly overnights) will be a key factor in determining whether the other home has become the person's residence. But in *Haddow*, our supreme court held that "time alone" does not control the inquiry; instead, what ultimately matters is whether the time there was "spent *as a resident*." *Id.* at 674 (emphasis added, quotation otherwise simplified). In other words, even if a person spends "a substantial amount of time" at another home, a court may still conclude that the person is not residing there based on additional facts and circumstances about the nature of that person's relationship to both the home and its other occupants. *Id.* at 673. In *Scott*, our supreme court accordingly stressed that the residency question "focuses on a person's status and place in the home." 2020 UT 54, ¶ 45.

¶32 On this record, it's clear that Julie spent a substantial amount of time at Boyfriend's home, particularly in the summer months of 2021. And it's also clear that she did so because she was in a romantic and intimate relationship with him. But again, Julie did not stay at Boyfriend's home unless Boyfriend was there, she did not have a key, she had no ownership interest in his home, she commonly ate elsewhere, she did not receive her mail there, and she did not keep her personal belongings there. From all this, it seems clear enough that she did not "come and go" at her leisure, *Haddow*, 707 P.2d at 673, nor did she regard Boyfriend's home as her "settled abode," *Knuteson*, 619 P.2d at 1389 (quotation simplified). Instead, it appears that she was there as a visitor, not as a resident. *See Scott*, 2020 UT 54, ¶ 45.

¶33 Although the district court assessed the cohabitation analysis using the common law test, it specifically determined

that Julie and Boyfriend did not "share[]" Boyfriend's "residence." And as indicated, this is a determination that receives "substantial deference on appeal." *Id.* ¶ 34. On this record, we see no basis for reversing that determination. As a result, even if this case is evaluated under the new statutory definition of "cohabit," this determination is sufficient to support the court's ruling. We therefore affirm the district court's conclusion that Julie did not cohabit with Boyfriend.

## CONCLUSION

¶34    We affirm the district court's determination that Glen did not establish that Julie and Boyfriend cohabited. As a result, we also affirm its denial of Glen's petition to modify the decree to terminate his alimony obligations.[6]

-----------

6. The district court denied Julie's request for attorney fees below, and Julie does not challenge that denial on appeal. In reliance on Utah Code section 30-3-3(1), however, she asks us to award her the attorney fees she incurred on appeal in the first instance. But our supreme court has held that an ex-spouse's "efforts to resist [a] motion to terminate alimony are not compensable under Utah Code section 30-3-3's plain language." *Scott v. Scott*, 2017 UT 66, ¶ 32, 423 P.3d 1275. We accordingly decline Julie's request.